**Jennifer CASEY, Plaintiff,**

v.

**Ken RIEDEL, and State of Iowa, Department of Human Services, Defendants.**

**No. CIV.4–00–CV–20334.**

United States District Court, S.D. Iowa, Central Division.

March 29, 2002.

Jeffrey M. Lipman, Lipman Law Firm PC, Ted E. Marks, Marks Law Office, Des Moines, IA, for plaintiff.

Charles Lavorato, Attorney General of Iowa, Julie A. Burger, Attorney General, Special Litigation Division, Des Moines, IA, for defendants.

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BREMER, United States Magistrate Judge.

The Court has before it Defendants' Motion for Summary Judgment (Clerk's No. 29). Plaintiff claims Defendants retaliated against her for asserting her civil rights, thus violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.2000e— 2000e–17 (1994 & West Supp.1998), and the Iowa Civil Rights Act (ICRA), Iowa Code chapter 216 (1998). Plaintiff further claims that Defendants violated state law when they wrongfully discharged her, through constructive discharge, in violation of public policy. Plaintiff seeks compensatory and punitive damages, and injunctive relief.[1]

Defendants move for summary judgment on the following bases: The Eleventh Amendment bars the claims under the ICRA and for wrongful discharge; under Title VII and the ICRA, Plaintiff has not provided sufficient evidence to establish her prima facie case of retaliation; and summary judgment is appropriate on the wrongful-discharge claim because the ICRA preempts the cause of action, and Plaintiff has not generated sufficient evidence to support the claim.

Defendants filed a Supplement to their Motion on November 9, 2001. Plaintiff's Resistance to Motion for Summary Judgment was filed February 19, 2002. This matter is fully submitted.

## I. STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment if no genuine issue exists as to any material facts, and if the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, a court must give the non-moving party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Ra-*

---

**1.** In her resistance to the Motion for Summary Judgment, Plaintiff voluntarily dismissed her claims under 42 U.S.C. § 1983 against all Defendants. (Mem. Supp. Res. Defs.' Mot. Summ. J. at 22.) Plaintiff also voluntarily dismissed all her claims against Judy Holmes, Mary Ellison and Michelle Moore. *Id.*

*dio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is inappropriate, however, where the record permits reasonable minds to draw conflicting inferences about a material fact. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

## II. MATERIAL FACTS NOT IN DISPUTE

Unless otherwise indicated, the following facts are either undisputed or viewed in the light most favorable to Plaintiff, Jennifer Casey, the non-moving party.

Casey began working for Defendant State of Iowa's Council on Vocational Education on March 19, 1991, as a clerk-typist. In the following year and a half, Casey's performance score improved from 2.92, "Needs Some Improvement," to 3.58, "Competent—meets standards." (Pl.'s Ex. 1 at 177.)

In February 1993, Casey switched jobs and started working as a secretary with the Iowa Correctional Institution for Women (ICIW) in Mitchellville. On January 5, 1995, ICIW's warden promoted Casey to Grievance Officer/Administrative Assistant 2. Her duties included recruiting, training, and overseeing volunteers. In both jobs, Casey earned performance-evaluation scores placing her between the categories, "Competent—meets standards and/or requirements," and, "Very Good—exceeds standards and/or requirements." *Id.* at 164–65, 167–68.

In January 1997, Casey received a lateral transfer to the job of Volunteer Family Coordinator. She alleges that in March 1997, a supervisor, Captain Richard Hutton, began sexually harassing Casey. Hutton allegedly made sexually explicit comments to her and left harassing telephone calls on her voice mail. Casey complained to other supervisors about Hutton's actions, and she filed a formal complaint. Casey alleges that as a result of her complaints, she was subjected to retaliatory harassment at ICIW. On approximately November 25, 1997, Casey filed a complaint with the Iowa Civil Rights Commission (ICRC) alleging sexual harassment and retaliation. The retaliation and harassment allegedly continued and included heightened scrutiny of Casey's work and the issuance of reprimands to her.

Casey resigned from ICIW effective February 5, 1998, to accept a job in Polk County with Defendant Department of Human Services (DHS) as a Public Service Supervisor II. Casey supervised approximately 13 employees who typed social workers' Child Protective Investigation (CPI) reports from a transcriber, and photocopied, processed, and filed reports. State statutes impose deadlines for completing the reports. Casey testified in her deposition that after learning her department had a problem with losing files, a problem that existed before she became supervisor, she implemented a new report-tracking system.

On March 20, 1998, Defendant Ken Riedel, Casey's supervisor, expressed to her his concern about Carolyn Mathis, Casey's subordinate who operated the Central Registry System (CRS), a database system. Mathis was behind in her CRS work. Casey testified that Mathis had a backlog before Casey became her supervisor. To alleviate the problem, Casey arranged for training additional employees to operate the CRS.

Between March and May 1998, approximately five of Casey's employees were fired or resigned. Of those who resigned, some did so to accept promotions; some said they resigned because of Casey's management style.

Casey testified that by May 1998, the report-tracking system she had imple-

mented had improved the problem of lost reports.

On May 27, 1998, Riedel met with Casey. Defendants contend, and Casey disputes, that Riedel discussed Casey's work deficiencies. Casey testified that the meeting was "a normal ... meeting with him to review processes and procedures and get his input and update him." (Casey Dep. at 99.)

Casey testified that historically support-staff supervisors in her office and other counties had shared with each other their employees' help when needed to catch up on processing CPI reports; the practice helped keep down overtime pay. Casey testified that her department had used help from other counties before she become supervisor, and the practice was not unusual. On July 20, 1998, Casey sought help from other support-staff supervisors in surrounding counties in catching up on her department's CPI reports.

On July 22, 1998, Casey filed a lawsuit in Iowa District Court against ICIW, the Iowa Department of Corrections (IDOC), and certain individuals, alleging sexual discrimination and retaliation. Believing her lawsuit might receive media attention, Casey met with Riedel on July 22 and told him about the case. Casey asserts that Riedel said her job was safe and would be unaffected by her lawsuit, and that any problems were minor and could be worked through. Riedel states that he discussed job-related issues with Casey, and he confirms he told her he was not going to "release her." (Pl.'s Ex. 4.) Casey alleges that before she told Riedel about her lawsuit, her employer had never told her she was doing her job poorly, and never mentioned that her job was in jeopardy.

Casey asserts that after she told Riedel about her lawsuit, she suffered various adverse employment actions, some of which are listed below:

• On July 23, 1998, Riedel asked Casey to meet with him again. At this meeting, Riedel told Casey she had performance problems and he wanted her to look for another job. Riedel contends his statements were not retaliatory and had no relation to her lawsuit. Casey alleges Riedel said, "I could just rate you substandard and that could be discipline and I could go from there," and implied that he would find false reasons for disciplining her. (Pl.'s Statement Facts at ¶ 32–34.)

• Her supervisors' attitude towards her changed, and they began to display a negative attitude towards her in the presence of her subordinates.

• Certain co-worker supervisors, Michelle Moore and Mary Ellison, accused Casey of acting with unprofessional misconduct at a meeting on August 5, 1998. Although Casey denied the allegations, her employer later suspended her as a result of the accusation.

• Connie MacLlelan, one of the social-worker supervisors, told Casey it was not in MacLlelan's best interests, due to feared retaliation, for her to talk with Casey at work, but that Casey could call her at home.

• Casey's ability to do her job was hampered because she no longer was included in supervisors' meetings or in making decisions regarding work changes, and because Riedel directed Casey's subordinate, Vicki Guse, to act as a quasi-supervisor and report directly to Riedel and Ellison on matters concerning staff members.

• Ellison, MacLlelan's supervisor and head of the Child and Adult Protective unit, and her staff members began bypassing Casey and seeking needed information from Casey's staff.

• Judy Holmes, the human resources director, would no longer communicate

with Casey, and was unavailable when Casey had questions. Holmes degraded, criticized and screamed at Casey about her work in the presence of Casey's subordinates.

● Riedel degraded and yelled at Casey in the presence of Casey's subordinates and co-workers. Riedel told one of Casey's subordinates to document what Casey did for future use against her, which undermined Casey's ability to perform her job.

● After Casey filed her lawsuit, Riedel instructed Casey's subordinates to document everything that Casey did and said for the purpose of using it against her in the future.

● On August 18, 1998, Riedel gave Casey a performance evaluation for the six-month period of February 1 through July 31, 1998. In the evaluation, Riedel stated Casey did not meet expectations in any of the scored performance categories: problem solving, teamwork, customer service, work quality/quantity, work methods, technical knowledge, leadership, and support for the organization.

● On August 24, 1998, Riedel suspended Casey for five days as a result of her poor performance evaluation and her alleged professional misconduct at the August 5 meeting. In his letter to Casey about her suspension, Riedel noted that the IDOC had twice disciplined Casey for violating rules concerning respectful treatment of staff.

● In September 1998, Casey was not allowed to make corrections or oversee work performed by her subordinate Guse.

● On October 6, 1998, Riedel gave Casey a negative performance evaluation for the two-month period of August 1 through September 30, 1998. As in his previous evaluation, Riedel stated that Casey did not meet expectations in any

of the following categories: problem solving, teamwork, customer service, work quality/quantity, technical knowledge, leadership, and support for organization. Riedel, however, graded Casey's performance as "Meets or Exceeds Expectations" in work-methods. (Pl.'s Ex. 1 at 116–126.)

After receiving the suspension in August 1998, Casey grieved the suspension and Riedel's August 18, 1998, low evaluation of her job performance. Sometime in August 1998, she began receiving treatment from a physician for stress. Casey and DHS included the October 6 negative evaluation in discussions regarding settlement of Casey's grievance.

On November 13, 1998, after Casey's grievance had proceeded through the third step of the grievance process, the parties agreed to settlement terms. The agreement provided that DHS would remove from Casey's file the negative six-month performance evaluation signed August 18, 1998, replacing it with a performance evaluation that reflected a competent rating. Riedel prepared a substitute evaluation rating Casey as "Meets or Exceeds Expectations" in all performance categories for the period. *Id.* at 127–34. As part of the settlement, DHS agreed to reduce the five-day suspension to a two-day suspension for Casey's conduct during the August 5, 1998, supervisor's meeting. For her part, Casey accepted a demotion to an Income Maintenance Worker II job effective November 27, 1998.

On November 19, 1998, Casey's physician, George Kappos, M.D., wrote the following memorandum:

I have been seeing the above named patient for several health problems for the last few weeks. Her health is being affected by conditions in the workplace. It is my medical opinion that her condition is worsening and that she needs to

be off work in order to help her rehabilitation and to prevent further deterioration in her condition. I am recommending that she should be off work for the next two weeks at which time she will be reevaluated.

Pl.'s Ex. 8. On December 4, 1998, Casey's psychologist wrote in a letter:

I have been seeing [Casey] for work-related stress problems for almost a year. In November she left her current position with some possibility of taking another job within the state organization. I do not feel that this is in [Casey's] best interest since this is likely to perpetuate the symptoms for which she came to see me.

Pl.'s Ex. 12.

On December 4, 1998, Casey resigned. In her resignation letter, Casey stated that her doctor advised her to resign due to "ongoing health problems created by my working conditions." (Pl.'s Ex. 1 at 4.)

## III. ANALYSIS

### A. Title VII and ICRA Retaliation Claims

#### 1. The ICRA Claim and Eleventh Amendment Immunity

■ Defendants assert, and the Court agrees, that the Eleventh Amendment bars Casey's claims under the ICRA against DHS in this court. *See Kane v. State of Iowa Dep't of Human Services,* 955 F.Supp. 1117, 1132 (N.D.Iowa 1997).

■ Casey also named Riedel as a defendant to the ICRA claim, in which Casey seeks money damages and prospective injunctive relief.

■ The Eleventh Amendment bars Casey from imposing under the ICRA a liability that must be paid from public funds in the state treasury against Riedel in his supervisory capacity. *See Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding Eleventh

Amendment constituted bar to retroactive payment of benefits found to have been wrongfully withheld by state officials); *Van Pilsum v. Iowa State Univ. of Science,* 863 F.Supp. 935, 940 (S.D.Iowa 1994). Eleventh Amendment immunity, however, is not available to Riedel in his supervisory capacity against claims seeking prospective injunctive relief under the ICRA. *See Edelman,* 415 U.S. at 664, 667–68, 94 S.Ct. 1347 (cited in *Klingler v. Director, Dep't of Revenue,* 281 F.3d 776, 777 (8th Cir.2002) (per curiam)); *Van Pilsum,* 863 F.Supp. at 940 (limiting claims to requests for prospective injunctive relief under ICRA, as well as under 42 U.S.C. § 1983, in so far as claims were brought against individual defendants in their official capacities).

■ Riedel may, moreover, be held individually liable to Casey for money damages under the ICRA. *See Van Pilsum,* 863 F.Supp. at 940; *Vivian v. Madison,* 601 N.W.2d 872, 878 (Iowa 1999) (holding that a supervisory employee is subject to individual liability for unfair employment practices under the ICRA); *cf. Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598, 609 n. 10, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Americans With Disabilities Act case) (citing *Edelman,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662).

#### 2. Prima Facie Case

Defendants maintain that Casey has not established a prima facie case of retaliation.

■ To establish a prima facie case of retaliation under Title VII, a plaintiff must show sufficient proof that she engaged in activity protected by Title VII, she was subjected to an adverse employment action, and a causal connection existed between participation in the protected activity and the adverse employment action.

*Gagnon v. Sprint Corp.*, 284 F.3d 839, 849–50 (8th Cir.2002) (stating burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to retaliation claims, absent direct evidence of discrimination); *Hunt v. Nebraska Public Power District*, 282 F.3d 1021, 1026–27 (8th Cir. 2002).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to advance a legitimate, non-retaliatory reason for the adverse employment action. *Hunt*, 282 F.3d 1021, at 1026–27; *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir.2001). If the defendant makes this showing, the burden shifts back to the plaintiff to show the defendant's proffered reason was a pretext for unlawful discriminatory retaliation. *Hunt*, 282 F.3d 1021, at 1026–27; *Rheineck*, 261 F.3d at 757; *Bennett v. Watters*, 260 F.3d 925, 930 (8th Cir.2001) (age discrimination case). The plaintiff must produce sufficient evidence of the elements of a prima facie case and, where necessary, adduce sufficient proof of pretext to meet the traditional tests of summary judgment. *Ryther v. KARE 11*, 108 F.3d 832, 838 (8th Cir.) (en banc) (age discrimination case), *cert. denied*, 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

Iowa law calls for applying to an ICRA claim the same elements under a standard similar to the Title VII standard. *See Barrera v. Con Agra, Inc.*, 244 F.3d 663, 665–66 (8th Cir.2001); *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 864 (Iowa 2001).

Defendants concede that Casey has satisfied the first element of her prima facie case of retaliation: She filed a lawsuit against ICIW and IDOC based on a claim of sexual discrimination.

### a. Adverse Employment Action

Casey alleges that Defendants subjected her to several adverse actions, as listed in part above, after she told Riedel about her lawsuit on July 22, 1998.

For purposes of the present Motion, Defendants concede only that Casey suffered an adverse employment action on July 23, 1998, when Riedel told her that her job performance was substandard and she needed to look for another job, and on August 18, 1998, when Riedel gave her a substandard evaluation. Because Defendants contest whether Casey has raised sufficient evidence as a matter of law to show a causal connection between an adverse employment action and her civil rights lawsuit, the Court will consider whether the adverse employment actions suffered by Casey include more than the two actions that Defendants concede are adverse employment actions.

■ "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Gagnon*, 284 F.3d 839, 850–51. This standard is met by discharge, reduction in pay or benefits, and other changes in employment that significantly affect an employee's future career prospects. *Id.* at 850–51; *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir.2001) (citations omitted).

■ A series of retaliatory conduct falling short of discharge or termination can constitute an adverse employment action. *McGregory v. Crest/Hughes Tech.*, 149 F.Supp.2d 1079, 1091–92 (S.D.Iowa 2001) (quoting *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105 n. 16 (8th Cir.2000)); *see Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245–46 (8th Cir.1998) (holding that when taken together, employer's actions showed employment was adversely affected in material way, when employer

began to communicate with employee more by electronic mail and worked with her less on one-to-one basis, which hampered employee's ability to do job, and employer excluded employee from some management meetings that she would have been expected to attend, and denied employee vacation time; stating court looks at combined effect of employer's actions to determine if discrimination occurred). A series of retaliatory conduct constituting adverse employment action may include reduction of duties, disciplinary action, negative personnel reports, and "papering" a file to support the employer's ultimate recommendation of termination. *McGregory*, 149 F.Supp.2d at 1091–92 (holding plaintiff had provided evidence that defendants subjected him to series of retaliatory conduct including disciplinary action, negative personnel reports, "papering" his file, race-based humiliating names in the presence of co-workers, and demotion that, even though not triggering a salary reduction, meant a substantial reduction in duties and lacked supervisory status).

Many of Casey's claims of adverse employment action involve ostracism and rudeness by supervisors and co-workers. Such ostracism and rudeness, however, do not rise to the level of an adverse employment action, unless evidence indicates the behavior had an impact on the employee's job title, salary, benefits, or any other material aspect of employment. *Gagnon*, 284 F.3d 839, 850–51 (holding employee failed as matter of law to establish alleged ostracism by supervisor and co-workers rose to level of actionable retaliation, where testimony showed supervisor ignored employee and it became hard for him to function as member of supervisor's team, but employee provided no evidence that supervisor's behavior affected employee's job title, salary, benefits, or any other material aspect of employment); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir.1997) (holding disrespect

and ostracism did not constitute adverse employment action, because no tangible change in duties or working conditions occurred).

Similarly, an employer's admonishment to an employee does not constitute actionable retaliation, unless the admonishment resulted in reduced salary, benefits, seniority, or responsibilities, or any other materially significant disadvantage. *Gagnon*, 284 F.3d 839, 850–52 (explaining holding in *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425 (8th Cir.1998)). Unfavorable evaluations might be actionable, if the employer uses them as "a basis to detrimentally alter the terms or condition of employment." *Id.* at 850–52 (holding employee's allegation that written admonishment resulted in closing of job openings to him and lost opportunity to compete for any job, if true, might support retaliation claim). "Papering" an employee's file with negative reports and reprimands may support a retaliation claim, if the reprimands adversely affect or undermine the employee's job. *Id.*

Defendants concede, and the Court agrees, that Riedel's admonishment on July 23, 1998, and his negative performance evaluation on August 18, 1998, which resulted in a suspension, amounted to adverse employment actions. In addition, Casey has produced sufficient evidence to indicate that the allegedly false accusation of Casey's professional misconduct at the August 5, 1998, meeting was an adverse employment action, because it also caused her suspension. Other adverse employment actions include, but are not limited to, the suspension, the second negative evaluation, and acts that hampered Casey's ability to do her job, such as excluding her from supervisor meetings, and Riedel's directing Casey's subordinate to sometimes act as supervisor in certain situations. The Court need not analyze the

sufficiency of evidence supporting each of Casey's allegations of ostracism, rudeness, and admonishments to determine if each individually constituted an adverse employment action; it is sufficient that, when viewed in the light most favorable to Plaintiff, she has provided sufficient evidence of actions that could cumulatively be found to constitute an adverse employment action.

The Court holds Casey has set forth sufficient evidence to create an inference of retaliatory conduct constituting adverse employment action. Casey has established the second element of her prima facie case.

### b. Causal Connection

■ Defendants contend that no causal connection exists between Casey's sexual-harassment lawsuit and the adverse employment action, which Defendants identify as the substandard performance evaluation on August 18, 1998. Defendants assert that Casey's best evidence of a causal connection is the timing between the announcement of her lawsuit and the poor evaluation, but that the temporal relationship alone is insufficient to establish a genuine issue concerning a causal connection, especially when, Defendants maintain, Casey received a substandard performance evaluation, "after months and months of poor performance which included chronic lost reports, extensions and employees leaving due to Plaintiff's treatment." (Defs.' Mot. Summ. J. at ¶ 3.)

Defendants further argue that Casey, suspecting her employer considered her job performance to be substandard, and knowing the time for her six-month performance evaluation was nearing, told Riedel about the lawsuit as a way to insulate herself from any adverse employment action. *See Smith v. Ashland, Inc.*, 250 F.3d 1167, 1173–74 (8th Cir.2001) (holding plaintiff could not avoid criticism of her job performance by complaining about workplace); and *Jackson v. St. Joseph State*

*Hospital*, 840 F.2d 1387, 1391 (8th Cir.) (holding that protection from complaining about illegal activity in workplace did not insulate employee from consequences of inadequate work performance), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). The Court finds that Casey has raised a genuine issue of material fact concerning whether, before she told Riedel about her lawsuit, she suspected her employer considered her job performance to be substandard. She disputes that Riedel discussed her work deficiencies at the May 27, 1998, meeting or any other time. Her evidence indicates she got no written admonishments or unfavorable evaluations before she filed the civil rights lawsuit.

■ Defendants are correct that the temporal connection alone is insufficient to establish a causal connection between the lawsuit and the poor evaluation. *See Gagnon*, 284 F.3d 839, 851–52 (stating temporal connection alone was insufficient to establish causal connection between evaluation and employee's Equal Employment Opportunity Commission (EEOC) claim, when employer issued evaluation one month after filing response to EEOC claim; to determine whether employee had established causal connection, court looked to remaining evidence, including fact that unfavorable evaluation clearly set forth on its face the reasons for issuance); *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir.2000) (stating timing of discharge should be evaluated in light of other evidence or lack of evidence). Other evidence a court may consider is whether the employer documented problems with the employee's performance long before the employer knew of the employee's protected activity. *See Smith*, 250 F.3d at 1174 (holding evidence did not support inference of retaliation based on temporal proximity, even though poor performance

review came a month after the plaintiff's complaint about alleged sexual battery, when evidence showed that employer documented problems with the employee's performance long before employer knew of employee's protected activity).

 Casey's unfavorable evaluation clearly set forth on its face the reasons for issuance. However, although Defendants argue that Riedel knew about problems in Casey's performance long before July 22, 1998, the only documentation of such problems is Riedel's May 29, 1998, draft of a letter he never sent to Casey. The letter draft is insufficient to support Defendants' Motion because the draft is not attached to a proper affidavit. *See Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir.1980); *Rill v. Trautman*, 950 F.Supp. 268, 269–70 (E.D.Mo.1996).[2]

Other evidence—Riedel's July 23, 1998, warning to Casey to find a new job a day after he told her that her job was not in jeopardy, his threat to write an unfavorable performance evaluation, and DHS's withdrawal of the unfavorable evaluation from her file and replacement with a favorable evaluation—permits a reasonable inference that, before July 22, 1998, Casey's employer did not see problems in her performance. Evidence that Riedel's demeanor and his relationship with Casey changed after he learned of her lawsuit offers further support for an inference of hostility towards Casey in response to her lawsuit. *See Coffman*, 141 F.3d at 1246. The timing of the August 18 evaluation in relation to the lawsuit, when considered with the other evidence of retaliatory motive, supports a reasonable inference that

2. Riedel states that on May 29, 1998, he drafted a letter of reprimand. (Riedel Aff.) Riedel discussed his letter with Holmes and another staff member, and they decided not to give the letter to Casey.

When evaluating evidence relevant to a motion for summary judgment, a court may not consider affidavits that fail to satisfy the requirements of Fed.R.Civ.P. 56(e). *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1315 (8th Cir.1996); *Engstrand v. Pioneer*, 946 F.Supp. 1390, 1398 n. 9 (S.D.Iowa 1996), *aff'd*, 112 F.3d 513 (8th Cir.1997) (unpublished). By definition "an affidavit is a 'sworn statement in writing made ... under an oath or on affirmation before ... an authorized officer.'" *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir.1990) (quoting *Webster's Third New International Dictionary* 35 (1965)). Riedel's purported affidavit does not meet the requirements for an affidavit stated in Rule 56(e), because it was not made under an oath or affirmation. Without support as required by Rule 56(e), the bare assertions in Defendants' brief and statement of material facts do not provide sufficient evidence to support Defendants' Motion for Summary Judgment. *See Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 n. 9 (1st Cir.1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-

serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment").

Riedel's drafted letter dated May 29, 1998, (Clerk's No. 31, at 1), suffers from a similar defect. The draft is unauthenticated and unaccompanied by a valid affidavit, and is therefore inadmissible. *Cummings*, 628 F.2d at 1068 (citations omitted) (uncertified medical records should not be considered by district court); *Rill*, 950 F.Supp. at 269–70 ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Federal Rule of Civil Procedure 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.") (citation omitted). The Court will not consider Riedel's letter dated May 29, 1998, when examining the merits of Defendants' Motion for Summary Judgment.

Furthermore, Riedel states that when he did not mail Casey the letter, he was concerned he "had not been clear enough with my expectations of Ms. Casey." (Riedel Aff.) If Riedel's affidavit were sufficient evidence to support Defendants' Motion for Summary Judgment, this statement would raise an inference that Riedel attributed any problem he perceived with Casey's performance to his failure to make his expectations clear to her.

Riedel's actions were motivated by the lawsuit. *See id.*

Furthermore, Defendants have not alleged or shown the lack of a causal connection between Casey's protected activity and other adverse employment acts, such as Riedel's July 23 warning, the allegedly false accusation of professional misconduct, Casey's suspension, the negative October 6, 1998, evaluation, and Casey's exclusion from supervisor meetings.

Viewing the evidence in the light most favorable to Casey, the Court holds that she has produced sufficient evidence to show a causal connection between her civil rights lawsuit and the adverse employment actions. She has raised a genuine issue of material fact creating an inference of retaliation. The Court therefore cannot grant Defendants' Motion for Summary Judgment on the basis that Casey has failed to produce sufficient evidence to establish her prima facie case.

### 3. Legitimate, Nondiscriminatory Reason, and Pretext

Because Casey met her initial burden to establish her prima facie case, the burden shifted to her employer to offer a legitimate, nondiscriminatory reason for its actions. *See Hunt,* 282 F.3d 1021, at 1026–27.

■ In challenging Casey's Title VII and ICRA claims, Defendants did not state a legitimate, nondiscriminatory reason for the adverse employment actions. *See* Brf. Supp. Mot. Sum. Judgment, at 4–9. Casey, therefore, did not brief this issue. In Defendants' discussion of Casey's wrongful-discharge claim, however, Defendants referred to the burden-shifting analysis and offered a legitimate, nondiscriminatory reason for the poor performance evaluation on August 19, 1998: "Casey was not competent at her job." *See id.* at 16. Defendants further state their analysis on the wrongful-discharge claim, "is identical to that set forth in the first section of this brief." *Id.* Even if the Court were to construe Defendants' assertion on the wrongful-discharge claim—Casey's performance was inadequate—as Defendants' offer of a legitimate, nondiscriminatory reason for the poor performance evaluation on August 18, 1998, under the Title VII claim, Defendants offered no legitimate, nondiscriminatory reason for the remaining adverse actions asserted by Casey: Riedel's warning to Casey on July 23, 1998; the allegedly false accusation of professional misconduct; Casey's suspension, the negative October 6, 1998, evaluation; the exclusion of Casey from supervisor meetings; and Riedel's direction to Guse to act as supervisor regarding certain matters in Casey's department.

Because Defendants did not meet their burden to offer a legitimate, nondiscriminatory reason for their actions, the burden did not shift to Casey to show Defendants' nondiscriminatory reason was a pretext for discrimination. Neither party briefed the issue of pretext for unlawful discrimination in relation to these claims. The Court therefore need not analyze the sufficiency of Casey's evidence of pretext. *Cf. Hunt,* 282 F.3d 1021, at 1029–30 (declining to reach plaintiff's evidence of pretext, and declining to consider whether former employer terminated plaintiff for reasons employer offered; when plaintiff did not meet initial burden, the burden did not shift to employer to offer nondiscriminatory reason for actions).

Defendants are not entitled to summary judgment on the retaliation claims under Title VII and those claims remaining under the ICRA.

### B. Wrongful–Discharge Claim

Casey claims that Defendants constructively discharged her in retaliation for her civil rights lawsuit, in violation of public

policy. Defendants argue they are entitled to summary judgment as a matter of law for the following reasons: The Eleventh Amendment bars the claim, the ICRA preempts this cause of action, and Casey has not generated sufficient evidence to support her claim.

 The Court's independent research has disclosed no case law holding that the Eleventh Amendment bars a claim in federal court for wrongful discharge against public policy under Iowa law. The Court cannot grant summary judgment on the wrongful-discharge claim on this basis.

 Defendants next maintain the ICRA preempts Casey's claim that Defendants constructively discharged her in violation of public policy, because her claim is premised on discriminatory acts. *See Borschel v. City of Perry*, 512 N.W.2d 565, 567–68 (Iowa 1994) (holding ICRA preempted claim of wrongful discharge in violation of public policy when claim was premised on discriminatory acts); *see generally Channon*, 629 N.W.2d at 858 (citing *Borschel*). Because of the exclusive nature of the ICRA's statutory remedy, "Preemption occurs unless the claims are separate and independent, and therefore incidental, causes of action." *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993). Claims are not separate and independent when success in the non-ICRA claim requires proof of discrimination. *Id.* In at-will employment situations, when the claim involves allegations of discrimination, "the claim of wrongful discharge and the claim of discrimination are one and the same." *Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa*, 473 N.W.2d 31, 34 (Iowa 1991).

The key in this case is the nature of the action: Whether Casey's wrongful-discharge claim asserts a discriminatory practice. In setting forth her wrongful-discharge claim in her Amended Complaint, Casey states as follows:

49. That the Defendants discharged Plaintiff from her employment with the State of Iowa (constructively) as set forth herein.

50. That the Plaintiff engaged in protected activity which included the filing of civil rights complaints (EEOC and ICRC) and an action in the Iowa District Court in Polk County, Iowa alleging, among other things, sexual harassment and retaliation against the State of Iowa and its supervisory agents.

51. That the retaliation Plaintiff was subjected to as set forth herein, was a violation of a clearly established public policy which prohibits retaliation for filing claims against one's employer.

. . . .

53. That the protected activity was a determining factor behind the decision to retaliate against the Plaintiff.

Am. Compl. at 11.

The Court holds that Casey's claim for wrongful discharge in violation of public policy involves allegations of a discriminatory practice, and is therefore preempted by the ICRA. The Court will not address Defendants' remaining challenge to this claim. Defendants are entitled to summary judgment on Casey's wrongful-discharge claim.

## IV. CONCLUSION

For the reasons outlined above, the Court holds as follows:

1. Plaintiff's claims under 42 U.S.C. § 1983 are dismissed.

2. All claims against Judy Holmes, Mary Ellison, and Michelle More are dismissed.

3. Defendants' Motion for Summary Judgment (Clerk's No. 29) is granted on the following claims:

a. Plaintiff's ICRA claims against DHS;

b. Plaintiff's ICRA claims against Defendant Riedel in his capacity as supervisor that seek to impose a liability, such as one for money damages or retroactive payments, that must be paid from public funds in the state treasury; and

c. Plaintiff's wrongful-discharge claims against DHS and Riedel.

4. Defendants' Motion for Summary Judgment (Clerk's No. 29) is denied on the following claims:

a. Plaintiff's Title VII claims for retaliatory discharge;

b. Plaintiff's ICRA claims seeking prospective injunctive relief from Riedel in his capacity as supervisor; and

c. Plaintiff's ICRA claims seeking to hold Defendant Riedel individually liable.

IT IS SO ORDERED.