Mary Evelyn **WILSON**, Plaintiff,

v.

**CITY OF DES MOINES**, Defendant.

No. 4:03–cv–40175.

United States District Court,
S.D. Iowa,
Central Division.

Oct. 5, 2004.

---

Paige E. Fiedler, Beth A. Townsend, Fiedler & Townsend PLC, Johnston, IA, for Plaintiff.

Steven C. Lussier, Asst. City Attorney, Des Moines City Attorney, Des Moines, IA, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

GRITZNER, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (Clerk's No. 10) and Plaintiff's Motion to Strike (Clerk's No. 19). The summary judgment motion seeks dismissal of all counts alleged in Plaintiff's Complaint. The motion to strike seeks to have portions of Defendant's summary judgment motion stricken. An oral hearing on the motions was not requested and the Court finds none is necessary. Attorney for the Plaintiff is Beth A. Townsend; attorney for the Defendant is Steven C. Lussier, Assistant City Attorney. The Court considers the motion fully submitted and ready for ruling.[1]

### PROCEDURAL HISTORY

Plaintiff, Mary Evelyn Wilson ("Wilson"), commenced this action against Defendant, City of Des Moines ("Des Moines" or "the City"), in this Court on March 28, 2003. Wilson's complaint asserts two

---

1. Counsel were advised of the nature of this ruling by conference call on October 1, 2004, due to a logistical delay in the filing of the Order and the upcoming final pretrial conference set for this date.

counts against Defendant.[2] Jurisdiction is proper pursuant to 28 U.S.C. § 1331, the federal question statute, as this case arises in part under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq. The Court has jurisdiction over Plaintiff's claims brought for violation of the Iowa Civil Rights Act ("ICRA") pursuant to the Court's pendant claim jurisdiction under 28 U.S.C. § 1367(a).[3]

The lawsuit arises out of alleged acts of discrimination based on gender, harassment, and retaliation, including the termination of Plaintiff's employment. On March 30, 2004, Defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendant seeks summary judgment on both counts and all claims asserted by Wilson in her complaint. Wilson opposes this motion. In addition, currently pending before the Court is Plaintiff's motion to strike portions of Defendant's statement of facts.

This matter presents a lengthy and detailed history, all of which must be considered to appreciate the totality of the circumstances underlying the claims. Accordingly, the Court will provide a lengthy summary of the material facts.

## BACKGROUND FACTS

### A. Wilson's Employment with the City

Wilson began working for the City in 1995. In September 1998, she began working in the job classification of Laborer in the Street Maintenance Division of the Public Works Department of the City. Wilson transferred to the Sidewalk Division of the Public Works Department in August 1999. Notwithstanding this transfer, she maintained working within the job classification of Laborer in the Sidewalk Division.

### 1. Promotion Opportunities

On June 26, 2000, Wilson was certified by the Des Moines Civil Service Commission on a list of employees qualified for promotion to the job classification of Cement Finisher. This certification was based, in part, on the results of a qualifying test taken and passed by Wilson. The Civil Service list expired June 26, 2002, two years after certification.

During the two-year life of the Cement Finisher certified list, only one employee was selected from the list for permanent employment. This employee, Bryan O'Neill, was appointed effective July 3, 2000. The Cement Finisher position filled by O'Neill was in the Park and Recreation Department and was ultimately based on the recommendation of Donald Tripp, Director of the Park and Recreation Department.[4]

During the two-year life of the certified list, Wilson was temporarily promoted to the position of Cement Finisher in the Public Works Department on two occa-

---

**2.** While Wilson's complaint only avers two counts, each of these counts alleges multiple claims. Under both her Title VII and ICRA counts, Wilson alleges claims for sex discrimination, sexual harassment, and retaliation.

**3.** Plaintiff filed charges of sex discrimination, sexual harassment, and retaliation against Defendant with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC") on approximately July 8, 2002. On approximately December 31, 2002, Wilson was issued an

Administrative Release from the ICRC, and on approximately January 28, 2003, she received a Notice of Right-to-Sue from the EEOC. Wilson then filed her complaint with this Court within the requisite 90 days.

**4.** The respective qualifications of Mr. O'Neill and Plaintiff will be discussed further in the analysis section assessing Wilson's claim that the failure to promote constitutes sex discrimination. *See* discussion *infra*, at section C.3.a.

sions. She received this temporary promotion for three months in 2000 and for five months in 2001. Her five-month temporary promotion during 2001 ended in December 2001. Todd Lawless, another Laborer in the Sidewalk Division of the Public Works Department, was also temporarily promoted to the position of Cement Finisher in 2000 and 2001 for three months and five months, respectively.

In May 2002, Wilson succeeded in being placed in the Civil Service list for the promotional position of Sewer Maintenance Worker. She received a promotion to Sewer Maintenance Worker in the Sewer Maintenance Division effective June 10, 2002.

### 2. Wilson's Sexual Harassment Complaints and the City's Response

#### a. Complaint About Jaschke

In early January 2001, Wilson complained to management about Roger Jaschke, her Section Chief in the Sidewalk Division. Wilson's handwritten complaint was given to Bruce Braun and identified four specific incidents of alleged discrimination. The four alleged incidents included the following: (1) On January 5, Jaschke would not give Wilson money from the City to buy a new shovel when Wilson's was locked in a different office, instead telling her to use a different shovel; (2) On January 5, Wilson took a snowblower that co-worker Todd Lawless had said he was going to use, and Jaschke called Wilson and her work partner back from the job site to exchange the snowblower she origi-

nally took (26 inches wide) for another one (22 inches wide); (3) On January 2 and 3, Jaschke gave Wilson an assignment to snowblow by herself near the 30th Street viaduct, which apparently was a large task not usually an assignment for one person; and (4) Wilson was reprimanded for using a vehicle for personal use.[5] In addition, Wilson complained Jaschke was "impatient", "rude", "treating me exceptionally bad", "really short with me", and "wasn't treating me fairly".

Bruce Braun passed Wilson's complaint to Willie Robinson, Equal Employment Administrator for the City, who conducted an investigation and reached conclusions as to the veracity of the complaint. Following interviews with several of Wilson's co-workers and with Jaschke himself, Robinson concluded he could not substantiate that Jaschke was treating Wilson differently because of gender. He did conclude, however, that there were hard feelings between Wilson and Jaschke because of a rumor [6] about Jaschke that Wilson allegedly brought into the workplace. Despite the existence of the hard feelings, Robinson could only find that Jaschke treated Wilson differently in the instance of the 30th Street viaduct assignment.

As a result of Robinson's findings, on or about February 14, 2001, William Stowe, the Public Works Director, issued a "written reminder" [7] by way of a letter to Jaschke. The written reminder was instigated by the conclusion that Jaschke's actions of assigning Wilson to work the 30th

---

**5.** Wilson claims at least two other people did the same thing, not resulting in a reprimand. In her deposition testimony, however, Wilson stated she had no first-hand knowledge of the two people doing so or that management had knowledge of the matter.

**6.** The nature of the rumor is irrelevant to the pending issues. Suffice it to say, Robinson

concluded Wilson introduced the rumor into the workplace, and the rumor continued to circulate up to the time of Wilson's complaint against Jaschke.

**7.** The "written reminder" is a form of discipline employed by Stowe.

Street viaduct alone and being short with her were inappropriate.[8] On or about February 14, 2001, Wilson was also issued a written reminder from Stowe by way of a letter.[9]

Stowe also informed Wilson and Jaschke that a mediation session was being arranged for them, and that they were expected to attend and successfully complete the mediation. The mediation session was conducted by an independent mediator at an off-site location and covered the issues between Wilson and Jaschke. At the conclusion of the session, Wilson and Jaschke drew up a mediation agreement covering the issues discussed during the session.

In addition, in January 2001, Robinson provided training to the Public Works Department employees on the City's non-discrimination policies, no-harassment policy,[10] and the internal complaint procedure for bringing complaints about the work environment to the attention of management. Wilson, Jaschke, and Keith McLey signed acknowledgments that they attended the training. A private mediator conducted another anti-harassment training session in late November 2001. Wilson, McLey, and Jaschke, along with the other employees in the Sidewalk Division, were required to attend the training.

### b. Complaint About McLey

In late September 2001, McLey complained to management about Wilson. In a meeting that included Jaschke, Braun, McLey, and Wilson, McLey complained that Wilson was not doing what he, as the

lead person, had directed at the job site. After McLey finished speaking, Wilson responded by stating that the real reason McLey was complaining about her was that he had been touching her, begging her to go out with him, and making lewd comments, and that she would not have anything to do with him.[11] As per instructions from management present, Wilson prepared a typed statement and handed it to Braun. Wilson stated that shortly after spring 2000, McLey would act like he was intentionally grabbing her breasts, put his hand on her leg, put his arm around her, and push his groin against her when she was bent over working. Braun reviewed the statement and forwarded it to Pat Kozitza, the Deputy Public Works Director.

Promptly after Wilson made her complaint, she and McLey were separated and were never again assigned to work on the same crew. Wilson did, however, see McLey constantly at work. Approximately two days later, Wilson met with Kozitza, Braun, and Robinson about her complaint against McLey. Management interviewed the co-workers Wilson mentioned as being able to substantiate her claims. Management also attempted to interview McLey, who refused to speak without union representation present.

A pre-disciplinary hearing was held for McLey. At the hearing, McLey denied participation in any sexual harassment but did make several allegations of workplace misconduct against various other employ-

---

8. Stowe also concluded, or at least accepted Robinson's conclusion, that Jaschke's actions were not based upon gender but rather upon the rumor introduced into the workplace by Wilson.

9. Wilson's February 14 written reminder will be discussed further, *infra* section A.3.

10. The City's no-harassment policy is broader than Title VII's prohibition of discrimination on the basis of protected class status.

11. Wilson states the reason she did not report the harassment sooner was because she was still able to do her job but after McLey's report, she had had enough.

ees, including Wilson.[12] Upon conclusion of the hearing and the investigation into Wilson's complaint, Stowe concluded that McLey had violated the City's sexual harassment policy. Stowe disciplined McLey with a "decision-making leave", a form of discipline that is standard in Public Works as a substitute for suspension without pay. After Wilson made her complaint, she and McLey had no further conversations, and McLey never did anything to Wilson that she considered offensive.

### c. Complaint About Gering

In October 2001, Wilson was assigned to a crew consisting of Scott Gering and Clyde Ficek. In early November 2001, Wilson complained to a supervisor that Gering would not ride with her but would rather ride with Ficek, the crew truck driver, both to the job site and during the day when Ficek would leave to dump the truck. Wilson considered Gering's leaving with Ficek as not working. On or about November 15, 2001, Gering complained that Wilson was falsely accusing him of not working. There-after, Gering was assigned to a different crew, leaving Wilson and Ficek as the sole members of the crew. Wilson concedes that neither Gering nor Ficek ever said anything sexually inappropriate to her.

On February 5, 2002, Braun asked Wilson if she was having any more problems in the workplace. According to Braun,[13] Wilson stated that no one was treating her

inappropriately though some people were not friendly with her.

### d. Iowa Civil Rights Complaint

On July 8, 2002, Wilson filed a complaint with the Iowa Civil Rights Commission ("ICRC").

### 3. Disciplinary Measures Against Wilson and Revocation of Safety Award

#### a. September 28, 1999 Written Warning

On or about September 28, 1999, Wilson received a written warning for not showing up or calling in on September 21, 1999.[14] On October 24, 2000, after the City received a citizen complaint, Roger Jaschke investigated whether Wilson was using inappropriate language in public at a sidewalk construction site. On or about December 21, 2000, Wilson received a written reprimand from William Stowe, Public Works Director Designee, and was docked one hour of pay for leaving her work location without supervisory authority and then driving to her home in a City vehicle, purportedly for the purpose of using a telephone.

#### b. Wilson's February 14, 2001 Letter

As noted earlier, on February 14, 2001, Stowe issued a written reminder to Wilson by way of letter. This written reminder was for introducing a rumor into the workplace about Jaschke. Wilson had received

**12.** Stowe decided that McLey's allegations should also be investigated. See discussion infra, section A.3.

**13.** Wilson does not remember this conversation but does not deny that it could have taken place.

**14.** Wilson does not contest the accuracy of this assertion. She does, however, contend this fact is irrelevant as it predates the con-

duct at issue in the case and is only put forth to "disparage Plaintiff." To the contrary, Plaintiff does state that prior to complaining of sexual harassment she had a "good record," and Defendant maintains this fact is relevant to assessing this characterization. The Court agrees that the fact is relevant, but notes that any weight for or against the parties' arguments is negligible.

information from someone she believed to be Jaschke's sister-in-law. Wilson admitted that she introduced the rumor into the workplace. The City claims the written reminder was not in response to the making of a complaint of sexual harassment or discrimination.

#### c. Wilson's November 1, 2001 Letter

Following the allegations made by McLey in his pre-disciplinary hearing, management investigated the alleged misconduct. A pre-disciplinary hearing was held with Wilson regarding the allegations McLey levied against her. Following the hearing, Stowe issued a letter of admonition to Wilson addressing three issues. First, Wilson had brought photographs of a scantily clad woman into the workplace, which management found unacceptable. Second, Wilson had a penchant for hugging co-workers in the workplace, which again management found unacceptable. Third, Stowe addressed Wilson's failure to promptly complain about McLey's harassing conduct. According to the City, this letter was not discipline as it indicated that while discipline was considered, none was being imposed.

#### d. Incident at Supply Yard

On February 15, 2002, Braun heard from supervisor Dennis Peterson that Wilson became upset and left work for the day with Peterson's permission. Some of Wilson's co-workers stated at the time that Wilson called Lawless a "motherfucker" and stated she would not sit next to him in the truck, though Wilson does not recall using this term or speaking with Braun about the incident. Wilson believes Lawless hated her, though she had no problem with him, and he never said anything sexually inappropriate to her.

#### e. April 2002 "Decision-making Leave"

On April 1, 2002, Wilson and Paul Lines were assigned to clean off and stack old paving bricks onto pallets at the Public Works supply yard. At approximately 11:00 a.m. that day, Roger Jaschke[15] observed that both Wilson and Lines appeared to be sleeping in their City truck. Jaschke directed Wilson and Lines to see Braun about the incident. A pre-disciplinary hearing for Wilson was held wherein Jaschke described his observations. Wilson has stated that she was resting her eyes. William Stowe disciplined Wilson with a decision-making leave as a result of this incident. Lines also received a decisionmaking leave due to this incident.

At her pre-disciplinary hearing, Wilson stated she and others had witnessed Jaschke sleeping at a safety conference held on April 2, 2002. Braun investigated this accusation, the results of which were forwarded to Stowe, who concluded Jaschke had not been sleeping and did not discipline Jaschke.

#### f. Revocation of Safety Award

In early 2002, the Labor/Management Safety Committee of the Public Works Department planned a program to recognize and reward employees in the Department that had worked for five years in Public Works without a lost-time work injury. That program included a breakfast, ceremony, certificate, and eight-hour reward. Department staff, including Rod Biondi and Nancy Brown, undertook to identify those employees that qualified for the reward. During this process, Wilson's start date with the Department was misidentified as April 1996. Based on this information, Wilson received the safety incentive reward.

**15.** Jaschke was supervisor for both Wilson and Lines.

Braun later learned that Wilson and Randy Banks, another Department employee, were not actually qualified for the rewards received based on an inadequate length of service. After verifying this information, Braun requested that Human Resources deduct the eight-hour reward from the time banks of both Banks and Wilson.[16] The eight-hour reward was deducted from both Wilson and Banks on April 19, 2002, though both Biondi and Braun did not expect Wilson's deduction to occur until later. It was later determined that McLey was also not qualified for the reward, and his eight-hour reward was deducted as of June 14, 2002.

### g. April 26, 2002 Letter

During the morning of April 19, 2002, Wilson asked that she be placed on sick leave for the rest of the day, saying she did not feel well and was going home. Instead of going home, Wilson admits she went to City Hall to inquire about her safety incentive award, spending approximately one hour of sick leave time pursuing this issue. A pre-disciplinary hearing was held on April 24, 2002, following which Stowe issued Wilson a letter informing her she would lose one hour of sick time for her misuse of sick leave. This letter was not considered a form of discipline.

### 4. Job Assignments

In addition to the allegedly discriminatory job assignments Wilson was assigned by Jaschke in 2001, during February, March, and April 2002, Wilson was assigned to clean, stack, and wash old paving brick at the Public Works supply yard for a certain number of hours. Paul Lines was also assigned to work on the bricks during the same time period, and others had been assigned during the prior five years. Wilson alleges this job assignment was in retaliation to her sexual harassment suit.

### 5. Wilson's Termination

#### a. Incident at the Levee

On June 10, 2003, Wilson and Ron Walker were working at repairing a sewer intake. During the morning, Wilson had been tearing out the sewer intake and placing chunks of concrete in the back of the City truck. At approximately 11:20 a.m., Wilson and Walker left the jobsite for the purpose of unloading the truck, with Wilson driving the vehicle. The truck had at least 3,000 pounds of broken concrete in the back.

As they made their way to the dump, Wilson and Walker stopped near Top's, a local restaurant, where they had previously called for a carry-out order. Upon receiving the food, Wilson drove the truck to a levee to park at the suggestion of Walker, who had previously performed work at the location. Wilson and Walker sat in the truck and ate their lunch for approximately 10–15 minutes.

When Wilson attempted to drive away, the levee surface collapsed, and the rear dual tires on the passenger side fell into a cavity to a depth that the undercarriage of the truck was sitting on the ground. Wilson called City employee Brian Wilson to ask for assistance in extracting the truck. Johnson was working with Craig Wadsworth, and he told Wilson they were unable to assist her at that time. Wilson then called another City employee, Mark McCuane, for assistance, and McCuane said he would send Jim Keifer to pull her out.

Before Keifer arrived, Johnson and Wadsworth appeared and tried to move Wilson's truck. Johnson sat in Wilson's

---

**16.** This request was made on April 4, 2002, for Banks, and April 18, 2002, for Wilson.

truck while Wadsworth drove the other truck. This attempt failed, apparently because of the angle of the vehicles and the way the wheels were being turned. Keifer arrived with a similar truck to that brought by Johnson and Wadsworth but was sent away in view of the recent failed attempt.

Wilson then called Ken Murray at the Public Works supply yard. Murray arrived about 15 minutes later with an end loader. The employees were able to extract the truck from the hole in the levee using the end loader. Wilson did not notice any damage to her vehicle at this time. Wilson made all of these calls from her personal cell phone and not from the truck radio, apparently to keep things on the "lowdown".

Wilson and Walker then left the levee and headed toward the City dump. On their way, Wilson turned into a private lot to turn around and head to the supply yard instead of the dump out of fear that the truck would get stuck at the dump. After Wilson turned the steering wheel to the left, she could not turn it back to the right. Wilson tried to call McCuane from her truck radio, but Murray called her on her phone because the radio message was breaking up. Wilson told Murray the problem and that she needed the City garage. Murray called the garage for her, and 15 minutes later a tow truck from the garage arrived. The driver of the tow truck made an unidentified adjustment under the truck that allowed her to turn the steering wheel. She then drove her truck to the City garage while the tow truck driver followed.

Wilson left the truck at the garage and then obtained a replacement truck, though her daily report showed only the use of the first truck. Wilson does not know who authorized use of the second truck. She did report steering problems of her truck but did not identify any damage to the truck or turn in the repair form to her supervisor. After the truck was repaired, Wilson was told that City Administrator Jay Bennett was asking about the circumstances surrounding the damage to Wilson's truck. Wilson went to Bennett's office and recounted the incident at the levee, admitting that she would not have told him had he not learned of the incident. Rick Powell, Wilson's immediate supervisor, was never told by Wilson about the incident.

### b: Failure to Appear for Work on Time

On or about June 23, 2003, Wilson overslept and did not report to work on time. She was awakened by someone calling from Powell's phone, though Wilson did not answer. Shortly thereafter, Wilson did call Rick Powell to tell him she would be right in, arriving sometime before 9:00 a.m. that day.

### c. Termination From Employment

Stowe informed Wilson by letter dated June 25, 2003, that her employment was being terminated effective June 25. Stowe made the ultimate recommendation of termination to the City Manager, the hiring authority. The termination letter specifically cited Wilson's misconduct in connection with the June 10 levee incident, her tardiness on June 23, her previous last chance decision-making leave in April 2002, and her further citation for misconduct that occurred within two weeks of the April 2002 decision-making leave. The City concluded from these incidents that Wilson had demonstrated a pattern of untrustworthiness in her work.

Stowe noted multiple reasons for concluding Wilson committed misconduct in the June 10 levee incident. First, as a lead person, she should have known better

than to park at the levee instead of traveling directly between work sites. Second, upon becoming stuck, she called several co-workers to extricate the truck, thereby taking them away from their assigned work. Third, at no time did she notify her supervisor of the incident which resulted in damage to her truck. Finally, when reporting the vehicle damage, she listed it merely as steering problems and did not mention the levee incident as the possible cause and then failed to notify her supervisor of the damage to her vehicle. In short, Wilson violated several City policies.

## ANALYSIS

■ Wilson alleges that the City, her former employer, is liable for sex discrimination, sexual harassment, and ultimately retaliation when it terminated her employment in violation of Title VII and the ICRA.[17] The City contends these claims must be dismissed as a matter of law and brought its motion for summary judgment seeking that end.

### A. Plaintiff's Motion to Strike

As an initial matter, the Court turns to Plaintiff's motion to strike portions of Defendant's filings. Specifically, Plaintiff requests the Court strike paragraphs 17 and 18 of Defendant's statement of facts filed in conjunction with its motion for summary

judgment, pursuant to Federal Rule of Civil Procedure 12(f). Fed.R.Civ.P. 12(f).

Wilson contends paragraphs 17 and 18 constitute what are essentially legal conclusions couched as allegations of fact. *See Brainerd v. Potratz*, 421 F.Supp. 836, 839 (N.D.Ill.1976). She states this is clearly inconsistent with the requirements of the statements of fact. Wilson further avers the paragraphs in question violate Rule 8(e)(1) to the extent that it is a pleading by failing to comply with the Rule's requirement that "[e]ach averment of pleading shall be simple, concise, and direct." Fed.R.Civ.P. 8(e)(1).

Meanwhile, the City contends paragraphs 17 and 18 are an attempt by Defendant to state facts in a manner demonstrating how, under the governing law, they are material but do not create a genuine issue for trial. The City maintains the form used is proper pursuant to the requirements of Local Rule 56.1(a)(3), which requires the moving party to prepare "[a] statement of material facts, filed separately, setting forth each material fact as to which the moving party contends there is no genuine issue to be tried."[18]

■ While courts have recognized that pleadings that fail to comply with Rule 8(e)(1) may be stricken in their entirety, *see Moscowitz v. Brown*, 850

---

**17.** The Iowa Supreme Court applies the same analysis in interpreting the ICRA and "look[s] to the ADA and federal regulations implementing that act in developing standards under the ICRA for disability discrimination claims." *Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 60 (Iowa 1999) (citing *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 918 (Iowa 1997), and *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 435–36 (Iowa 1988)). Because of the similarity of analysis, the Court will analyze Plaintiff's Title VII and ICRA claims together. *See Crock v. Sears, Roebuck & Co.*, 261 F.Supp.2d 1101, 1113 n. 8 (S.D.Iowa 2003) (analyzing ADA and ICRA claims together because the ele-

ments of liability are the same); *Barnes v. Northwest Iowa Health Ctr.*, 238 F.Supp.2d 1053, 1063–64 (N.D.Iowa 2002) (same).

**18.** As explained by the Supreme Court, "[a]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992).

F.Supp. 1185, 1189 (S.D.N.Y.1994), abrogated on other grounds, *Lauture v. IBM Corp.*, 216 F.3d 258 (2d Cir.2000), such an extreme result is not warranted here. Indeed, to the extent paragraphs 17 and 18 of Defendant's statement of facts violated the Federal Rules of Civil Procedure, either by stating a legal conclusion or by failing to comply with Rule 8(e)(1), the Court disregarded them in analyzing Defendant's motion for summary judgment.[19] Consequently, the Court denies Plaintiff's motion to strike as essentially moot under these circumstances.

## B. Standard for Summary Judgment

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be rendered

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). To avoid summary judgment, the nonmoving party must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *See Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (" 'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' ") (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ The nonmoving party must go beyond the pleadings, and by affidavits, depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *see also Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir.1995) (finding that in employment discrimination cases, "the plaintiff's evidence must go beyond the

---

**19.** The Court confronts the motion to strike in the context argued by the parties and under the unique circumstances of this case. However, the Court could also deny the motion to strike as improper. Rule 12(f) of the Federal Rules of Civil Procedure provides that a "court may order stricken from any *pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). According to the language of Rule 12(f), motions to strike apply only to pleadings and not to motions. *See Knight v. United States*, 845 F.Supp. 1372, 1374 (D.Ariz.1993); *Krass v. Thomson–CGR Med. Corp.*, 665 F.Supp. 844, 847 (N.D.Cal. 1987). Pleadings include complaints, answers, replies to counterclaims, answers to cross-claims, third-party complaints, and third-party answers. *See* Fed.R.Civ.P. 7(a); *see also Knight*, 845 F.Supp. at 1374 n. 5

(discussing what constitutes a pleading as defined in Fed.R.Civ.P. 7). Therefore, a motion to strike a motion for summary judgment, or any part thereof, is inappropriate and should be denied. *See Jones v. Topeka*, 764 F.Supp. 1423, 1425 (D.Kan.1991) (finding defendants' motion to strike plaintiff's motion for partial summary judgment should be denied because court can strike pleadings but not motions); *Superior Beverage Co. v. Ohio*, 324 F.Supp. 564, 564–65 (N.D.Ohio 1971) (finding defendant's motion to strike plaintiff's amended motion for summary judgment inappropriate); *see also Knight*, 845 F.Supp. at 1374 (finding plaintiff's motion to strike defendant's motion for summary judgment was not a proper motion to strike under Rule 12(f) because it applied to a motion and not to a pleading).

establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action."). While the quantum of proof that must be produced to avoid summary judgment is not precisely measurable, it must be enough evidence for a reasonable jury to return a verdict in favor of the non-movant. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

In considering a motion for summary judgment, the Court must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir. 1996). The question before this Court is whether the record, when viewed in the light most favorable to Wilson, shows there is no genuine issue as to any material fact and that the City is entitled to judgment as a matter of law. *See Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1326 (8th Cir.1995) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548, and *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505).

■ The Eighth Circuit has repeatedly cautioned that summary judgment should rarely be granted in employment discrimination cases. *See Keathley v. Ameritech Corp.,* 187 F.3d 915, 919 (8th Cir.1999); *Lynn v. Deaconess Med. Ctr.-West Campus,* 160 F.3d 484, 486 (8th Cir.1998); *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998); *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994). "Because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing

summary judgment." *Bell v. Conopco, Inc.,* 186 F.3d 1099, 1101 (8th Cir.1999); *see also Weiland v. El Kram, Inc.,* 233 F.Supp.2d 1142, 1149 (N.D.Iowa 2002) (citing *Crawford,* 37 F.3d at 1341).

■ The Eighth Circuit has qualified this principle by explaining that notwithstanding this consideration, summary judgment "is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1055 (8th Cir.2000); *see also Duffy v. Wolle,* 123 F.3d 1026, 1033 (8th Cir.1997) ("While 'summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case.' ") (quoting *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615–16 (8th Cir. 1997)). In short, "[s]ummary judgment is appropriate in employment discrimination cases only in 'those rare instances where there is no dispute of fact and where there exists only one conclusion.' " *Weiland,* 233 F.Supp.2d at 1149 (quoting *Johnson v. Minn., Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991)).

**C. Sex Discrimination and Retaliation**

Wilson asserts claims of sex discrimination and retaliation under both Title VII and the ICRA in her complaint. Title VII prohibits an employer from discriminating or retaliating against an employee for engaging in "protected activity," which is either opposing an act of discrimination prohibited by Title VII or participating in an investigation under Title VII. 42 U.S.C. § 2000e–3(a); *see also Hunt v. Nebraska Public Power Dist.,* 282 F.3d 1021, 1028 (8th Cir.2002). The ICRA contains similar protections. *See* Iowa Code § 216.11(2). The City seeks to have Plaintiff's claims on

these grounds dismissed on summary judgment. Because Wilson's assertion of these claims consists basically of the same underlying factual allegations, they will be discussed together.

### 1. Sex Discrimination Standard

■■ To establish a prima facie case of gender based employment discrimination, the Plaintiff must prove (1) that she is a member of a protected class, (2) that she was qualified to do the job, (3) that she suffered an adverse employment action, and (4) that persons of the opposite sex were not treated in the same manner. *See Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999). In the event that the Plaintiff establishes a prima facie case of sex discrimination, the burden-shifting analysis comes into play and the Defendant must articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Plaintiff must then rebut the proffered reason with evidence of pretext or discriminatory animus. *Id.* at 804–05, 93 S.Ct. 1817.

Allegations based on mere speculation are insufficient. *See Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir.1998) (finding bald assertions and conclusory affidavits insufficient to support an inference of pretext); *Nitschke v. McDonnell Douglas Corp.*, 68 F.3d 249, 252 (8th Cir.1995) (finding comparison to other employees is only valid if the other employees are similarly situated or otherwise "comparable" to the plaintiff); *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994) (finding that plaintiff's mere recitation of incidents in which white employees were allegedly less severely disciplined was insufficient).

### 2. Retaliation Standard

■ To establish a prima facie case of retaliation, Wilson must prove the following elements: (1) she engaged in a protected activity such as filing a charge of harassment; (2) her employer subsequently took some sort of adverse employment action against her; and (3) the adverse action is causally linked to the protected activity. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 968 (8th Cir.1999); *see also EEOC v. Kohler Co.*, 335 F.3d 766, 772–73 (8th Cir.2003); *Cross v. Cleaver*, 142 F.3d 1059, 1071 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir.1998). To be actionable, an "action claimed to be retaliatory must be sufficiently adverse to have created a material change in the employment, 'such as a change in salary, benefits, or responsibilities.'" *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004) (quoting *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 691 (8th Cir.2001)). In other words, "[n]ot everything that makes an employee unhappy constitutes an actionable adverse employment action." *Id.* For example, a negative employment review is only actionable if used to detrimentally alter the terms or conditions of employment, *id.* (citing *Spears v. Mo. Dep't of Corrs. & Human Res.*, 210 F.3d 850, 854 (8th Cir.2000)), and minor changes in responsibility or working conditions are not adverse employment actions if they do not result in a materially significant disadvantage to the employee. *Id.* (citing *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016–17 (8th Cir.1999)).

■ It is well established that Plaintiff must show a causal connection between the protected activity engaged in and an adverse employment action to establish a retaliation claim. *Scusa*, 181 F.3d at 970; *Harris v. Sec'y of U.S. Dep't of the Army*, 119 F.3d 1313, 1318 (8th Cir.1997). Evi-

dence that an adverse employment action is taken after protected activity is insufficient on its own to create a submissible case of retaliation. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346–47 (8th Cir.1996); *see also Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992) ("The mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the claim.").

■ In addition, temporal proximity on its own is generally insufficient to show a causal connection. *Bradley v. Widnall*, 232 F.3d 626, 633 (8th Cir.2000); *see, e.g., Gagnon v. Sprint Corp.*, 284 F.3d 839, 851–52 (8th Cir.2002) (finding that plaintiff fired one month after filing charge of discrimination failed to establish causal link without more evidence than temporal proximity); *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir.1997) (finding six months insufficient); *Nelson*, 75 F.3d at 346–47 (finding one month insufficient); *Sweeney v. City of Ladue*, 25 F.3d 702, 703–04 (8th Cir.1994) (finding two months insufficient). However, in some circumstances temporal proximity can establish causation. *See Mitchell v. Iowa Protection & Advocacy Servs., Inc.*, 325 F.3d 1011, 1014 (8th Cir. 2003) (finding that temporal proximity can itself establish causation in some situations); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir.2002) (same); *see, e.g., EEOC v. HBE Corp.*, 135 F.3d 543, 554–55 (8th Cir.1998) (finding termination within several hours sufficient to establish retaliatory inference); *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir.1989) (finding thirty days sufficient); *Keys v. Lutheran Family & Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir.1981) (finding slightly less than two months suffi-

cient); *Kunzman v. Enron Corp.*, 902 F.Supp. 882, 904 (N.D.Iowa 1995) (finding 20 days sufficient).

■ In the absence of direct evidence of retaliation, courts apply the *McDonnell Douglas* burden-shifting analysis. *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980) (applying the *McDonnell Douglas* burden-shifting analysis to Title VII retaliation claims). Under this analysis, if the Plaintiff establishes a prima facie case of retaliation, a presumption of unlawful discrimination exists. *Hunt*, 282 F.3d at 1028; *Stuart v. GMC*, 217 F.3d 621, 634 (8th Cir.2000). The employer must then offer a legitimate and nondiscriminatory reason for the adverse employment action to overcome this legal presumption. *Hunt*, 282 F.3d at 1028; *Stuart*, 217 F.3d at 634. If the employer meets its burden, the presumption of retaliation disappears. *Cross*, 142 F.3d at 1071–72. The burden then shifts back to the employee to offer evidence that the proffered reason is pretextual, *Hunt*, 282 F.3d at 1028; *Stuart*, 217 F.3d at 634; *see also Texas Dep't of Cmty. Affairs*, 450 U.S. at 253, 101 S.Ct. 1089 (finding "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination"), or that the proffered explanation is "unworthy of credence." *Weiland*, 233 F.Supp.2d at 1151–52. This test applies to both the Title VII and ICRA retaliation claims. *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999).

■ Merely disputing the reason proffered by the employer is not enough to show that reason is a pretext for discrimination. *Stuart*, 217 F.3d at 634. Rather, the employee must show that the reason given was false and that discrimination is the real reason behind the adverse employment action. *Id.; see also St. Mary's*

*Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). However, the Plaintiff "need not disprove all possible reasons for his discharge. He need only offer sufficient evidence to support a reasonable inference that he was terminated [for an illegal reason]." *HBE Corp.,* 135 F.3d at 555.

A plaintiff with a retaliation claim has the opportunity to critically examine the proffered business reasons to determine whether the employer is telling the truth. *Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1101 n. 1 (8th Cir.1988), abrogated on other grounds, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Plaintiffs may in part meet their ultimate burden of proof in an employment discrimination case by proving the defendant's proffered reason is unworthy of belief. *Reeves,* 530 U.S. at 146–47, 120 S.Ct. 2097. In addition, the plaintiff's testimony alone is enough under some circumstances to create a genuine issue of material fact to preclude summary judgment. *See Kenney v. Swift Transp., Inc.,* 347 F.3d 1041, 1045–46 (8th Cir.2003).

A plaintiff may also establish pretext by showing it was not the employer's policy or practice to respond to such problems in the manner it responded in plaintiff's case. *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 727 (8th Cir.2001). In addition, instances of disparate treatment can support a claim of pretext. *Weiland,* 233 F.Supp.2d at 1156. Keeping in mind that "[c]ourts do not sit as super-personnel departments to second-guess the business decisions of employers," *Dorsey v. Pinnacle Automation Co.,* 278 F.3d 830, 837 (8th Cir.2002) (citing *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998)), the Court must determine whether Wilson has established the Defendants' proffered reason was pretextual or otherwise unwor-

thy of belief. *See Reeves,* 530 U.S. at 146–47, 120 S.Ct. 2097; *Stuart,* 217 F.3d at 634.

The anti-retaliation provisions of Title VII and the ICRA do not, however, insulate an employee from discipline for insubordination or ongoing violations of the employer's policies just because they occur after the plaintiff engages in protected activity. *See, e.g., Smith v. Ashland, Inc.,* 250 F.3d 1167, 1174 (8th Cir.2001) (noting that employee may not avoid discipline for poor work performance simply because she engages in protected activity, especially where the performance problems were noted by the employer prior to the protected activity); *Jackson v. St. Joseph State Hosp.,* 840 F.2d 1387, 1391 (8th Cir.1988) ("Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct"); *Hulme,* 480 N.W.2d at 43 (noting that "the protection afforded by anti-retaliation legislation does not immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination"). In other words, an employer is not prevented from enforcing its policies with an employee merely because that employee has engaged in some protected activity.

Furthermore, it not within the province of the Court to determine the wisdom of a company's decision as courts are not in the business of making personnel decisions and are not equipped to act as human resource experts. *Stuart,* 217 F.3d at 637 ("The wisdom of a company's decision to terminate its employee for what this Court may regard as a frivolous reason is not an issue in a Title VII case."). "The core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legit-

imate nondiscriminatory reason for discharging its employee, but rather concerns whether 'the employment decision was based upon intentional discrimination.'" *Stuart,* 217 F.3d at 637 (quoting *Ryther v. KARE 11,* 108 F.3d 832, 837–38 (8th Cir. 1997)).

### 3. Alleged Instances of Sex Discrimination and Retaliation

Plaintiff asserts numerous instances of alleged sex discrimination and retaliation in her complaint against the City. These include a failure to promote, the timing and type of disciplinary measures taken against her, the conduct of co-employees, the job assignments she was given, the revocation of her safety award, and the termination of her employment.

#### a. Failure to Promote

Wilson asserts that the City's failure to promote her constitutes sex discrimination. Specifically, she claims the fact a male was promoted to the Cement Finisher position instead of her, even though she scored higher on the qualifying test, is evidence she was discriminated against based on sex. The man, Bryan O'Neill, was promoted to the position on or about July 3, 2000.

The City first contends that this assertion fails because the statute of limitations has run. In any event, the City argues that the claim fails because it had a legitimate, nondiscriminatory basis for the promotion. Wilson asserts the claim is within the statute of limitations based on the "continuing violation" doctrine, and that the City does not have a legitimate, nondiscriminatory purpose for its actions. However, the City contends a failure to promote is considered a discrete act and cannot constitute a continuing violation.

Wilson filed her complaint with the ICRC, which was cross-filed with the EEOC, on July 8, 2002. The City contends this is beyond the 300–day statute of limitation for Title VII claims, and the 180–day limitation for claims under the ICRA, for Wilson's claims based on a failure to promote. However, under the continuing violation doctrine, "if a violation is continuing, the time does not begin to run when the discrimination first happens. Instead, the action is considered filed in time if there are discriminatory acts within the limitations period." *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 527 (Iowa 1990).

In discussing this doctrine, the Iowa Supreme Court relied on several opinions which found that a failure to promote represented a continuing violation. *See, e.g., Trevino v. Celanese Corp.,* 701 F.2d 397, 402 (5th Cir.1983); *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 348 (10th Cir.1975); *Annear v. State,* 419 N.W.2d 377, 379 (Iowa 1988). The City, however, contends this is not the law in the Eighth Circuit or in Iowa. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Tademe v. Saint Cloud State Univ.,* 328 F.3d 982, 987–88 (8th Cir.2003); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n,* 672 N.W.2d 733, 741 (Iowa 2003).

The court in *Hy–Vee* discussed two types of continuing violations. *Hy–Vee Food Stores, Inc.,* 453 N.W.2d at 527, 529. The four elements necessary for a series of acts continuing violation consist of the following: "(1) the alleged discrimination pervades the series of events, (2) there is a present violation of the statute, (3) the present acts of alleged discrimination are related to the time-barred events, and (4) the charge covering the present violations filed within the limitations period." *Id.* at 527. On the other hand, a "systematic policy of discrimination" may be challenged "even though the employee

was not denied a particular job or employment benefit within the limitations period" because this theory seeks to attack the system and not just the application of the system to the complainant. *Id.* at 529.

 The Federal and State approach to the limitations issue may differ to the extent that the failure to promote may be viewed as a discrete action, and the claim for failure to promote may be barred. However, regardless of whether the failure to promote is considered a discrete act or makes up part of a continuing violation, a factual distinction subject to some reasonable argument in this case, the City has asserted a legitimate, nondiscriminatory reason for the failure to promote, i.e., promotion of a more qualified individual and the unavailability of other promotional opportunities. Because Wilson is unable to rebut the proffered reasons and show they serve as a mere pretext, the Court need not discuss further the continuing violation doctrine or resolve its applicability to the present action.

Prior to his promotion to Cement Finisher, Bryan O'Neill was in the job classification of Semi-skilled Worker in the Park and Recreation Department. In April 2000, while the current Cement Finisher was on a leave of absence, O'Neill was temporarily assigned to perform the duties of the position. When he was promoted, O'Neill boasted eight years of concrete-related construction experience with the Park and Recreation Department.

On the other hand, at the time of O'Neill's appointment, Wilson had no experience as a temporary Cement Finisher with the City, nor did she have any training or experience in the construction trades prior to her employment in the City's Public Works Department. In fact, the bulk of her experience was obtained during the relatively short period she had been in the Sidewalk Division of Public Works.

In short, the City argues, and the Court agrees, that O'Neill had greater experience than Wilson both in the trade as well as in the classification in the Park and Recreation Department. While acknowledging that Wilson did receive the top score on the placement test and was at the top of the Civil Service list, this did not entitle her to be appointed first off the list. *See Zanfes v. Olson,* 232 Iowa 1169, 7 N.W.2d 901, 903 (Iowa 1943).

In addition, Wilson's claim for sex discrimination based on failure to promote fails as far as it relates to any failure to promote to a temporary Cement Finisher position following her promotion to Sewer Maintenance Worker. According to the evidence in the record, there are no temporary Cement Finisher positions budgeted for the Sewer Maintenance Division. There are seasonal temporary Cement Finisher positions available in the Sidewalk Division, Street Maintenance Division, and in Street Excavation; however, these positions must be filled from the pool of employees already in those divisions.[20] Thus, according to the City, Wilson's transfer to the Sewer Maintenance Division in June 2002 precluded her from temporary upgrades to Cement Finisher in 2002 and 2003. This is a legitimate, nondiscriminatory reason Wilson did not receive a temporary upgrade. Thus, Wilson cannot meet her burden of showing the City's proffered nondiscriminatory reason is merely a pretext for sex discrimination or retaliation. Accordingly, the failure to promote cannot serve as a basis for either

20. According to the City, this prohibition exists because the amount budgeted for the upgrade in each Division is only the incremental amount that the Cement Finisher position pays above the normal pay of a full-time position in that Division.

a sex discrimination or retaliation claim against the City under the circumstances of the present case.

### b. Disciplinary Measures Against Wilson

Wilson claims certain disciplinary measures taken against her are evidence of discrimination and retaliation. The City contends these disciplinary measures do not support Wilson's claims because they do not constitute an adverse employment action, there is a legitimate, nondiscriminatory reason for the discipline, and there is no evidence the City's reasons were merely a pretext for sex discrimination or retaliation.

■ Generally, in order to meet the adverse employment action element of a discrimination or retaliation claim, there must be a "material employment disadvantage." *See Kerns*, 178 F.3d at 1016 (sex discrimination); *Henthorn*, 359 F.3d at 1028 (retaliation). However, disciplinary actions short of termination have been held to constitute adverse employment actions for the purposes of making a prima facie case. *Casey v. Riedel*, 195 F.Supp.2d 1122, 1131–32 (S.D.Iowa 2002) (retaliation). These include a reduction in duties, disciplinary action, negative personnel reports, false accusations, *see id.*, threats, reprimands, harassment, or other adverse treatment. *See* E.E.O.C. Compliance Manual § 8–II(D)(1). "A pattern of reprimands for conduct that was not an issue before engaging in the protected activity is evidence that, when combined with the circumstances, including temporal, surrounding the discharge, could support an inference of retaliation." *Kirkland v. State Univ. of Iowa*, 2001 WL 737548, at *12 (S.D.Iowa May 1, 2001) (citing *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1106 (8th Cir.2000)).

■ According to the City, Wilson appears to contend she was discriminated or retaliated against by virtue of the November 1, 2001, letter. The City argues this cannot support a claim for sex discrimination or retaliation because it was not an adverse employment action and that, in any case, there is a legitimate, nondiscriminatory basis for the letter, and Wilson cannot show this reason was pretextual. Indeed, the letter was not considered discipline by Stowe, and there was no "material employment disadvantage" resulting from the letter. *See Kerns*, 178 F.3d at 1016; *Henthorn*, 359 F.3d at 1028.

The letter dealt with Wilson's bringing in an inappropriate photograph, her hugging other employees, and her failure to promptly complain about the harassing conduct of McLey. The first two issues dealt with in the letter, i.e., the photograph and the hugging, were first brought to light by McLey at his pre-disciplinary hearing for the harassment complained of by Wilson. The City argues this fact alone does not make Stowe's letter retaliatory. *See Moisant v. Air Midwest, Inc.*, 291 F.3d 1028, 1032 (8th Cir.2002) ("The written reprimand of which [plaintiff] complains was the result of facts that came to light during [employer's] investigation of her complaint, and the record will not support a finding that it was a result of an investigation intended to harass or intimidate her.").

The City further argues that Wilson's claims based upon her April 2002 discipline fail because a legitimate, nondiscriminatory reason exists for the actions for which there is no inference of pretext. Wilson was disciplined because she was apparently caught sleeping on the job. She contends that another male employee was not disciplined for the same conduct.

■ "[T]he 'relevant inquiry' in an employee misconduct pretext case is whether the 'employer believed [the] employee

guilty of conduct justifying [the adverse action].'" *Cronquist v. City of Minneapolis,* 237 F.3d 920, 928 (8th Cir.2001) (quoting *Harvey,* 38 F.3d at 972 n. 2). The City contends Stowe believed Wilson committed the misconduct asserted, i.e. sleeping on the job. The City further asserts the male individual charged with the same conduct was also disciplined with a decision-making leave. The other male employee Wilson points to was investigated but not disciplined as the complaint was determined to be unfounded, though the City contends this fact cannot create an inference of discriminatory or retaliatory animus because the circumstances of the Jaschke incident are not sufficiently similar to Wilson's. Jaschke was at a conference while Wilson was supposed to be working, and the investigations into the alleged misconduct reached different conclusions. The test for whether circumstances are similar in all relevant aspects is rigorous. *See Cronquist,* 237 F.3d at 928; *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 858 (8th Cir.2004).

■ If viewed in a vacuum, these incidents would not support a claim of discrimination or retaliation. Indeed, the City has advanced a legitimate, nondiscriminatory reason for the discipline taken, for which Wilson fails to show evidence of pretext so far as it relates to her claim of sex discrimination. However, when viewed under the totality of the circumstances, the Court finds the actions of the City give rise to an inference of retaliation sufficient to overcome summary judgment. The timing and type of discipline taken against Wilson give rise to sufficient questions of fact that are best left to the fact finder.

### c. Conduct of Co-employees and Job Assignments

The City contends the alleged ostracism by Wilson's co-employees and her assignment to undesirable job assignments are insufficient to support claims of sex discrimination or retaliation because neither meet the required element of being an adverse employment action. The conduct of co-employees that Wilson complains about is that some employees stopped talking to her following her complaints of harassment, and that one employee, Scott Gering, refused to ride in a truck with her.

The job assignments Wilson complains of include working on a two-person crew, cleaning and stacking bricks, and working a particular snowblower route alone. Wilson was never disciplined for not getting enough work done while working in a two-person crew. Moreover, while working on bricks at the supply yard, Wilson was joined by a male employee assigned to the same task. Finally, her snowblowing assignment occurred prior to any of the relevant complaints made by Wilson.

■ Co-worker ostracism and rudeness do not normally rise to the level of an adverse employment action. *Gagnon,* 284 F.3d at 850 (citing *Scusa,* 181 F.3d at 969, and *Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 693 (8th Cir.1997)). In addition, just because an employee finds a particular job assignment undesirable does not make it an adverse employment action. *Tuggle v. Mangan,* 348 F.3d 714, 721–22 (8th Cir.2003) (finding undesirable work assignments did not affect advancement and did not constitute adverse employment actions); *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997) (finding that "not everything that makes an employee unhappy is an actionable adverse [employment] action"); *see also Farmland Foods, Inc.,* 672 N.W.2d at 743 (finding "work assignment claims that do not affect an employee's permanent job title or classification will not normally be actionable as adverse").

▉▉ Again, these actions alone are insufficient to support a claim of sex discrimination or retaliation. Indeed, Wilson is unable to meet the prima facie discrimination element of showing she was treated differently based on gender. However, when viewed under the totality of the circumstances, the Court finds the actions of the City give rise to an inference of retaliation sufficient to overcome summary judgment. The timing and type of job assignments given to Wilson may convince a jury of a pattern of retaliatory conduct against Wilson.

### d. Revocation of Safety Award

▉▉ The City contends that Wilson's complaints of discrimination or retaliation fail so far as they relate to the revocation of the eight-hour safety incentive reward because there is a legitimate, nondiscriminatory basis for the revocation that cannot be overcome with evidence of pretext. According to the City, the record indicates Wilson was not eligible for the award, and the original awarding of the incentive was a mistake based on the erroneous belief that her start date with the awarding Department was earlier than it actually was. Perhaps most damaging to her claim that revocation of the safety award was discriminatory or retaliatory is the fact that the City also debited eight hours of safety incentive time from two male employees, i.e., Randy Banks and Keith McLey also originally received the awards but were later found to be ineligible because of insufficient time in Public Works.

The revocation of the safety incentive award cannot serve as a basis for either a sex discrimination or retaliation claim. Wilson fails to even meet the elements of a prima facie case of discrimination, as she cannot show males were treated differently or even that her award was revoked because of her gender. Likewise, Wilson cannot rebut the legitimate, nondiscriminatory reason proffered by the City for revocation of the award, i.e., that she was not actually eligible for the award but that it was originally awarded by mistake. While the City may have handled this situation in a better manner, the City did handle it the same way for all of the employees that were mistakenly credited with the eight-hour award. Wilson has provided no evidence that the revocation of her reward was done with a retaliatory or discriminatory purpose.

### e. Termination of Employment

Wilson also contends her discharge on June 25, 2003, was because of sex discrimination and retaliation. Wilson does not believe she did anything wrong in conjunction with the June 10, 2003, levee incident. However, as asserted by the City, Wilson's role and actions in the levee incident suffice as a legitimate, nondiscriminatory reason for terminating Wilson, especially considering her past discipline.

According to the City, Stowe was the decisionmaker and could have believed that Wilson, as the lead person on the crew, should have known better than to drive on the levee. Under City guidelines, Wilson should have notified her Section Chief or Administrator about the incident and the resulting damage to her vehicle. In addition, even after this incident, Wilson was late to work on June 23, 2003. The City also points out the history of discipline taken against Wilson and that this led to Stowe's belief that Wilson had demonstrated a pattern of untrustworthiness and should be discharged for the accumulation of misconduct. Finally, the City argues that proximity in the timing of Wilson's March 28, 2003, discrimination lawsuit with her termination is not enough to support a retaliation claim. *See Kipp v. Mo. Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002) (finding "interval of two months between the complaint

and [employee's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [employee's] favor on the matter of causal link").

 The City is correct in its assertion that Wilson is unable to make a prima facie showing that her termination was discriminatory. There is insufficient evidence as to whether males were treated any differently, especially considering the previous incidents in Wilson's file. Wilson is unable to make a showing that similarly situated males would have been treated differently under these circumstances. Accordingly, the Court finds that Wilson has not made a prima facie showing of sex discrimination and that her claims on this basis should be dismissed as a matter of law.

 However, in the present case, Wilson's termination was merely the culmination of a series of events that could be found to be retaliatory. "[R]etaliatory conduct may consist of action less severe than outright discharge." *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (citations and quotations omitted). Indeed, "adverse employment action" has been defined to include "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments ... that ... can result without even the loss of money or benefits." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 863 (Iowa 2001) (citations and quotations omitted); *see also Casey*, 195 F.Supp.2d at 1131–32 (finding that "evidence of actions that could cumulatively be found to constitute an adverse employment action" is sufficient to make out a prima facie case).

As previously discussed, Wilson suffered disciplinary measures, changes in job assignments, and transfers beginning after her first complaint of harassment and continuing after each successive complaint she made. These tangible changes to her working conditions, *see Anderson v. Dillard's Inc.*, 109 F.Supp.2d 1116, 1127 (E.D.Mo.2000) (finding allegations of general hostility or verbal reprimands insufficient unless accompanied by "evidence of some more tangible change in duties or working conditions"), occurred in direct relation to her complaints of discrimination, with her termination coming within two months of her filing a formal complaint. In short, the Court finds that, under the totality of the circumstances, Wilson has provided evidence that indicates genuine issues of material fact remain as to whether the City engaged in a pattern of retaliatory conduct against Wilson that culminated in her termination.[21] Therefore, Wilson's claims of retaliation will not be dismissed at this stage of the proceedings.

**D. Sexual Harassment**

Defendant has also moved for summary judgment on the claims of sexual harassment asserted by Plaintiff. Wilson has brought claims for sexual harassment under Title VII and the ICRA. The claims are based on a theory of hostile work environment sexual harassment. The analysis on the state law claim is guided by federal law and federal cases. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989).

**1. Hostile Work Environment**

 Title VII provides "[i]t shall be an unlawful employment practice for an em-

---

**21.** In addition, the Court finds disturbing that Wilson almost invariably was disciplined in some manner after each complaint she made. Such a trend could have a chilling effect on future reports of harassment or discrimination. *See Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir.2000).

ployer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that sexual harassment that is so severe and pervasive as to alter the conditions of employment, thereby creating a hostile or abusive work environment, violates Title VII. *Faragher v. Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). This type of claim has come to be known as hostile environment sexual harassment.

 To establish an actionable hostile environment sexual harassment claim against a non-supervisory co-worker, Wilson must satisfy the following five elements:

(a) she belongs to a protected group; (b) that she was subject to unwelcome sexual harassment; (c) that the harassment was based on sex; (d) that the harassment affected a term, condition, or privilege of employment; and (e) that the employer knew or should have known of the harassment and failed to take proper remedial action.

*Scusa,* 181 F.3d at 965 (citations omitted); *see also Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975, 979 (8th Cir.2003) (quoting *Scusa,* 181 F.3d at 965).

The City seems to concede that Wilson can establish all of elements to establish a prima facie case of hostile environment sexual harassment except the final element. Defendant contends the City took prompt and remedial action to end the harassment. *See Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999) (citations omitted); *Cherry v. Menard, Inc.,* 101 F.Supp.2d 1160, 1179 (N.D.Iowa 2000) (citations omitted).

### a. Co-worker Harassment

The fifth and final element in a hostile environment sexual harassment claim where the alleged harassment is perpetrated by a co-worker is whether the employer failed to properly remedy harassment that it knew or should have known about. *Scusa,* 181 F.3d at 965; *Quick v. Donaldson Co.,* 90 F.3d 1372, 1378 (8th Cir.1996).[22] This means that an employer is only liable to an employee on a hostile environment action if the employer "knew or should have known of the harassment and failed to take proper remedial action." *Bailey v. Runyon,* 167 F.3d 466, 468 (8th Cir.1999) (citations omitted); *Chauffeurs Local Union No. 238 v. Civil Rights Comm'n,* 394 N.W.2d 375, 378 (Iowa 1986) (applying same standard to co-worker harassment claim brought pursuant to the ICRA).

 In assessing the reasonableness of an employers response to a complaint of sexual harassment, courts consider (1) the temporal proximity between the notice and any remedial action; (2) the disciplinary or preventive measures taken; and (3) whether the measures end the harassment.

---

22. This standard differs from cases involving supervisor harassment. In those cases, an employer has an affirmative defense if it can show "it exercised reasonable care to prevent sexual harassment and promptly corrected any harassment that did occur." *Beard v. Flying J. Inc.,* 266 F.3d 792, 799 (8th Cir. 2001); *see also Burlington Indus., Inc. v. El-lerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Here, the remedial response of the employer is an element of the prima facie case, rather than a defense, and indicates whether the employer is liable for the harassment.

*Meriwether v. Caraustar Packaging Co.,* 326 F.3d 990, 994 (8th Cir.2003) (citing *Stuart,* 217 F.3d at 633); *see also Robinson v. Valmont Indus.,* 238 F.3d 1045, 1047 (8th Cir.2001) ("When assessing the reasonableness of an employer's remedial actions, the court may consider the time that elapsed between the notice of the harassment and the remedial measures taken, including any disciplinary action against the harasser or other options available to the employer such as employee training sessions."); *Scusa,* 181 F.3d at 967–68 (same).

■ The law does not require an employer to fire or take any other particular type of action against an alleged harasser. *Bailey,* 167 F.3d at 468 (citing *Davis v. Tri–State Mack Distribs., Inc.,* 981 F.2d 340, 343 (8th Cir.1992)). Rather, the law only requires that the employer take such action as is reasonably calculated to end the harassment. *Id.* at 468–69 (citations omitted); *see also Scusa,* 181 F.3d at 967–68 (citing *Carter,* 173 F.3d at 702, *Zirpel v. Toshiba America Info. Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997), and *Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996)); *Jones v. United States Gypsum,* 126 F.Supp.2d 1172, 1178 (N.D.Iowa 2000). As long as the employer's response is prompt and adequate, the plaintiff will fail to meet this element. *See Meriwether,* 326 F.3d at 993–94 (affirming summary judgment where district court determined as a matter of law that the employer promptly and adequately responded to each of the plaintiff's complaints of harassment); *Robinson,* 238 F.3d at 1048 (same); *Stuart,* 217 F.3d at 633–34 (same); *Scusa,* 181 F.3d at 967–68 (same).

■ Thus, an employer has a duty to take prompt corrective action that is reasonably calculated to put an end to the harassment. *See Bailey,* 167 F.3d at 468–69 (citations omitted); *Swenson v. Potter,* 271 F.3d 1184, 1192 (9th Cir.2001). This obligation consists of two parts: first, the short-term, temporary steps taken to deal with the situation while the employer takes steps to determine whether the complaint is valid, and second, the permanent remedial steps taken following the completion of the investigation into the complaint. *Swenson,* 271 F.3d at 1192. If the employer fulfills both parts of this obligation in a prompt and adequate manner, then it is entitled to judgment as a matter of law. *See Meriwether,* 326 F.3d at 993–94.

#### b. The City's Response

Wilson alleges, in part, that she was sexually harassed by Keith McLey. The City contends that Wilson's claim of harassment based on the allegedly inappropriate actions of McLey fails because the City took prompt, effective remedial action after Wilson reported the alleged harassment.

■ The Eighth Circuit has held that "to be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" *Weyers v. Lear Operations Corp.,* 359 F.3d 1049, 1056–57 (8th Cir.2004) (quoting *Joens v. John Morrell & Co.,* 354 F.3d 938, 940 (8th Cir.2004)). Under this standard, the City argues that McLey was a co-worker and not a supervisor,[23] and thus

---

23. McLey's job classification was Cement Finisher. McLey and Wilson were on the same crew prior to the sexual harassment complaint forwarded by Wilson. McLey was the lead person on the crew. The City contends the lead person on a crew is the senior person on the crew but is still considered a co-worker. The City further states that while the lead person has additional responsibilities, those duties are not supervisory nor does the lead have the ability to discipline anyone.

Wilson must show that the City "knew or should have known of the conduct and failed to take proper remedial action" in order to meet the elements of a prima facie case. *Joens,* 354 F.3d at 940. The City argues that Wilson fails to make the requisite showing on this element. Wilson agrees that McLey was a mere co-worker and that this is the appropriate standard, but asserts that there remain genuine issues of material fact on this issue.

Wilson complained about sexual harassment by McLey in late September 2001 during a meeting in which McLey had complained about Wilson. Wilson's supervisor asked Wilson for her complaint in writing. As soon as she turned in her written complaint, Wilson and McLey were separated from working together. In addition, within two days an investigation was begun. Ultimately, according to the City, it was determined that McLey violated the City's sexual harassment policy and was disciplined with a decision-making leave. After Wilson's complaint, McLey did nothing to Wilson that she considered offensive.

However, Wilson disputes the City's characterizations of the actions it took following her complaint. She contends that the City failed to substantiate the complaint despite the corroboration from several of Wilson's co-workers. In addition, Wilson argues that the City failed to take any corrective action, though it did discipline her based on the resulting investigation. Furthermore, while McLey did nothing further to directly harass Wilson, she was forced to work around him every day even after she made her complaint. In short, Wilson contends the City failed to address the full extent of McLey's conduct and failed to fully investigate the extent of the harassment.

In late November 2001, the City provided additional anti-harassment training to the Sidewalk Division. McLey, Wilson, and Jaschke, their supervisor, received this training. In addition, according to the City, no other co-worker has sexually harassed Wilson in the workplace.

 However, as previously indicated, Wilson was in fact subject to certain conduct that a fact finder could consider harassing and retaliatory in nature. A reasonable fact finder could determine it was related to the sexual harassment she allegedly was subjected to by McLey. Under the current record, the Court is unable to find as a matter of law that the City took prompt, remedial action to end the harassment. While McLey never again worked on the same crew as Wilson, she did see him constantly in the workplace. In addition, Wilson was subjected to ostracism from co-workers for which there is no evidence that the City undertook action to address this form of harassment. Moreover, there is evidence in the record that Wilson was given unfavorable job assignments and was eventually transferred to a different department, where her new supervisors were warned about her. In short, there remain genuine issues of material fact as to whether the City took prompt, remedial action to end the hostile and harassing conduct that made up Wilson's work environment during her tenure with the City, especially that which she was subjected to following her complaints of harassment and discrimination.

## CONCLUSION

For the foregoing reasons, the Court hereby **grants in part** and **denies in part** Defendant's Motion for Summary Judgment (Clerk's No. 10). Specifically, the Court grants the motion as to Plaintiff's sex discrimination claims and denies the motion as to Plaintiff's retaliation and sexual harassment claims. On the latter two claims, there is sufficient evidence in the record to give rise to genuine issues of

material fact such that summary judgment is inappropriate on the record currently before the Court. In addition, as set forth above, Plaintiff's motion to strike (Clerk's No. 19) is **denied.**

**IT IS SO ORDERED.**