# IN THE COURT OF APPEALS OF IOWA

No. 16-1447
Filed January 10, 2018

**ANTOINETTE MARIE JOHNSON,**
    Plaintiff-Appellant,

**vs.**

**MENTAL HEALTH INSTITUTE, STATE OF IOWA,
GEORGEANNE CASSIDY-WESCOTT, MARK LYMAN,
IOWA DEPARTMENT OF HUMAN SERVICES**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Buchanan County, Michael J. Shubatt, Judge.

The employee appeals from the district court's grant of summary judgment for the employer, dismissing the employee's claims for racial discrimination and retaliation. **AFFIRMED.**

Bruce H. Stoltze Jr. of Stoltze & Stoltze, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and John B. McCormally and Barbara E.B. Galloway, Assistant Attorneys General, for appellees.

Heard by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

Antoinette Johnson filed a cause of action against her former employer, the Mental Health Institute,[1] claiming racial discrimination and retaliatory discharge.[2] MHI filed a motion for summary judgment and, following a hearing, the district court granted it—dismissing both of Johnson's claims.

On appeal, Johnson maintains the district court erred in its determination that she could not establish a prima facie case for discrimination because she could not prove she was performing her work satisfactorily at the time she was fired. Regarding her claim for retaliation, Johnson maintains the district court erred when it ruled she could not prove a causal connection between her complaints about being discriminated against and harassed and MHI's decision to fire her. In the alternative, the district court found that even if Johnson could prove both of her

---

[1] The Mental Health Institute (MHI) is a mental-health facility operated by the State of Iowa and the Iowa Department of Human Services (DHS). Johnson's claim against MHI also listed the State and DHS, as well as two other employees of MHI who supervised Johnson. We refer to the group of defendants as MHI throughout.

[2] Both parties agree that Johnson's original claim also alleged a hostile work environment. In the employer's appellate brief, they urge us to find the hostile work environment claim is time barred by Iowa Code section 216.5(13) (2015), even though "[t]he District Court did not rule on the issue." In her reply brief, Johnson responds with an argument that the statute of limitations does not apply.

But in the district court's ruling, the court stated, "At the outset of the hearing on the motion for summary judgment, Johnson's counsel agreed that the hostile work environment claim is untimely and should be dismissed. The remaining issue is whether Defendants are entitled to judgment as a matter of law on the claims of racial discrimination and retaliation." Additionally, in Johnson's filed "brief in support of resistance to motion for summary judgment, she "agree[s], that her Hostile Work Environment claim is barred by the statute of limitations."

We note that we have no record of the hearing, as it was unreported. In spite of the parties' apparent confusion about the status of the hostile-work-environment claim, we take as final the district court's word on the issue that Johnson conceded it was untimely at the hearing on the motion. In doing so, we note that neither party filed a posttrial motion challenging the court's statement.

Thus, we only consider Johnson's arguments as they apply to her claims for racial discrimination and retaliatory discharge.

prima facie cases, her claims still failed because she was unable to establish that MHI's stated non-discriminatory and non-retaliatory reasons for firing her were merely pretext; Johnson maintains this was in error.[3]

**I. Background Facts and Proceedings.**

Johnson began working at MHI in August 2007 as a residential treatment worker. She was responsible for the direct care of individual patients and worked under the supervision of a registered nurse. Part of the official description of Johnson's position includes "attendance at work and timeliness at work." Additionally, the "performance criteria" include: "[is] routinely at work on time" and "[i]s routinely at work as scheduled."

In January 2011, Georgeanne Cassidy-Wescott—a named defendant— became the Director of Nursing for MHI, putting her in charge of the nursing department. This placed Johnson in Cassidy-Wescott's chain of command.

In 2011, Cassidy-Wescott developed a progressive discipline schedule for unauthorized absences and tardiness, including disciplinary actions of written reprimands, suspension without pay, and termination. Under the policy, neither a

---

[3] This appeal included one 1072-page appendix, which contained 830 pages identified simply as "Defendant's Appendix Supporting Motion for Summary Judgment." *See* Iowa R. App P. 6.905(4)(a) ("The appendix shall include a table of contents identifying each part of the record included and disclosing the page number at which each part begins in the appendix."); *see also* Iowa R. App. P. 6.905(4)(c) ("If exhibits are included in the appendix, the table of contents shall identify each exhibit by the number or letter with which it was marked in the district court, give a concise description of the exhibit (*e.g.,* "warranty deed dated ..."; "photograph of construction site"; "Last Will and Testament executed on ..."), and state the page number at which the exhibit appears in the appendix."). Although these violations may seem inconsequential, compliance with the rules facilitates efficient navigation through an appendix, thus fostering our ability to achieve maximum productivity in deciding a high volume of cases. *See* Iowa R. Civ. P. 21.11.

supervisor's coaching and counseling session nor a written work directive given to the employee is considered a disciplinary action.

In March 2012, Mark Lyman, a registered nurse and another named defendant, became Johnson's supervisor.

In April, Lyman had a coaching and counseling session with Johnson to discuss her job performance because she had six incidents of unscheduled absences within the previous twelve months.

Johnson received two coaching and counseling sessions in May—one because she arrived twenty-five minutes late and another because she failed to inform her supervisor she had been arrested within twenty-four hours of the arrest, as work rules required.

Lyman had two more coaching and counseling sessions with Johnson in July due to an unexcused absence and her failure to follow the call-in procedure when she was absent.

In August, Lyman had a coaching and counseling session with Johnson after she was tardy to work. Lyman gave Johnson a written reprimand for a separate incident of tardiness when she arrived at work two hours late. Johnson received a second written reprimand in August when she had an unscheduled absence—her eighth in twelve months.

Johnson was given a one-day suspension without pay to be served on September 11 as a result of her five tardies between April and September.

In December, Lyman had a coaching and counseling session with Johnson after another unscheduled absence.

In January 2013, Johnson received a written reprimand for failing to follow the call-in procedure when she was absent and for having another no-call, no-show for work—her second since June 2012.

Johnson also received a written reprimand on February 14 for being fifty minutes tardy to work on February 2.[4]

On February 5, a verbal incident occurred at MHI between Johnson and a registered nurse, Tanya Keppler. According to the report from MHI's internal investigation, Johnson left a patient alone in the shower; Keppler reminded Johnson that it was against the institution's policy, as any patient in the "tub room" must be continuously observed. Keppler then told other employees, "Now I'm going to be accused of being a racist." A short time later, Keppler noticed Johnson had left a second patient unattended in the tub room. When Keppler again told Johnson that patients were not to be left alone, Johnson responded, "Whatever, Tanya." Within a few minutes, Johnson entered the nurse's station and overheard Keppler saying Johnson does not respect her. This led to a verbal confrontation between Keppler and Johnson, with both raising their voices. Another employee reported that Johnson attempted to walk away, but Keppler followed her. Johnson was seen bent over, rocking back and forth, covering her ears, and stating, "Stop, please stop" and "leave me alone." At least one employee reported Johnson was tearful by the end of the encounter.

Afterward, Johnson made multiple phone calls to Cassidy-Wescott to discuss the incident. During the first call, Johnson reported that she felt picked on

---

[4] Based on the record before us, it appears written reprimands were given anytime from one to four weeks after the date of the incident.

and did not believe it would get better. Johnson also reported for the first time that there was a doll[5] hung by its neck in the nursing station and claimed that it had been there for over a month.[6] During one of the calls, Johnson informed Cassidy-Wescott she had "just contacted [her] civil rights lawyer and showed him the papers from the last time."[7]

Cassidy-Wescott made the decision to separate and schedule the nursing staff so that Johnson would not be working on the same ward with Keppler. The new work schedule was effective the next day, February 6.

On February 13, as Lyman continued an investigation into the February 5 incident, Johnson stated the doll she saw at the nursing station was racially offensive and she believed it was meant to represent a black person. Johnson also reported that she believed the doll had been placed on the ward by Keppler and that she had heard another employee name Keppler as the person who had brought it. When that employee was asked to confirm Johnson's statement, he denied having any knowledge Keppler placed the doll on the ward.

The same day, Johnson followed up with a written complaint stating Keppler had harassed her.

---

[5] Although it was not immediately reported what the doll looked like, Johnson later posted photos of it on social media. The doll had blue yarn hair with a red-print fabric body.
[6] Several other employees were asked if they had seen a doll at the nursing station. Some stated they did not remember ever seeing one, and some employees stated they had seen it and it had been up for a day or "a couple days." The length of time the hanging doll was present is not a material fact.
[7] Johnson submitted complaints to the governor's office and DHS in the fall of 2012 before apparently voluntarily withdrawing them. The letter included complaints regarding how her coworkers and supervisor—Lyman—treated her and implied it was due to her race or sex, stating, "Oh yeah I'm the only black female on all three shifts that's how they could do the things that [were] done." Johnson has not included the 2012 complaint as part of her protected activity.

On February 21, the investigation into the incident ended. It did not resolve who had brought the doll onto the ward,[8] but MHI concluded there had been no discriminatory behavior. It determined, however, that a number of DHS work rules had been violated, and Lyman had individual coaching and counseling sessions with both Keppler and Johnson. Keppler's session included notes about ensuring her approach was appropriate when correcting or advising Johnson, and she was encouraged to seek help from her supervisor if necessary. Johnson's session involved coaching regarding her admitted violations of policy, including leaving a patient in the shower unattended and allowing patients to use her electronic device to play games.

On March 14, Johnson sent an email to DHS, complaining about Lyman and the results of the investigation into the February 5 incident. She again referenced being the "only black female in the work place [and] being harass[ed] by coworkers."

On March 19, Johnson received a one-day, unpaid suspension—to be served the same day—for a no-call, no-show on March 14. The written letter noted it was Johnson's third such absence in less than twelve months. Lyman was not the nurse supervisor who conducted the investigation of Johnson's absence or who signed the letter informing Johnson of the resulting suspension.

---

[8] MHI later learned—in April 2013—that a different, uninvolved employee had brought the doll onto the ward sometime around Christmas 2012. That employee, who worked a separate shift from Johnson, reported she had brought it in around Christmas and stated it was a joke about another, different residential treatment worker. At least one other staff member corroborated this account and stated the doll was hanging from a string on the back of it. Another employee described it as a homemade toy from the office Christmas party and stated it was more like a stuffed animal than a doll, as it had no facial features. This employee also stated that it was hanging by a string but not by its neck.

Johnson's emails to DHS were forwarded to Cassidy-Wescott on March 20.

Johnson met with Cassidy-Wescott on March 25. At the meeting, Johnson expressed that she felt Keppler had "got away" with harassing her and claimed Keppler had been harassing her for a year.

On April 5, Lyman gave Johnson a three-day suspension without pay for being forty minutes tardy for work on March 26. Per usual, the written letter informing Johnson of the suspension also indicated that more severe disciplinary action may be taken if she had further such incidents. Johnson was to begin serving her suspension on April 10.

While Johnson was out of the facility for her suspension, at least six employees called MHI to report Johnson was posting statements on social media of which MHI should be aware.[9] Keppler expressed concern about coming to work. Based on the content of some of Johnson's posts,[10] one of the doctors at MHI decided to place the facility on lockdown until Johnson returned to work on April 14.

Cassidy-Wescott made the decision to place Johnson on paid administrative leave pending investigation into Johnson's posts. Johnson was

---

[9] Johnson made nine separate posts; seven on April 12 alone. Some referenced the State of Iowa or MHI, and others referenced her three-day suspension. Several posts also referenced "Mrs. Lady," which Johnson later admitted was a reference to Cassidy-Wescott.

[10] Some of the language MHI determined may be threats of violence included, "Love my Brothers Thank You [name] And [name] nothing like having your Brothers Thinking They Protecting You Know They Will Kill For A Sister @ Anytime"; "No one will ever take anything away from me"; " YOU CHOSE THE WRONG NEGRO TO FUCK WITH AN[D] I WORK THE STATE OF IOWA YOU WANT WAR IM GIVING IT TO YOU"; and "YOU WANTED WAR YOU GOT IT THIS NEGRO IS READY FOR YOU AT ANYTIME ….IM NOT SCARED TO DIE." (Ellipsis in original).

informed of the decision when she returned to work at her scheduled time on April 14. As part of her paid leave, Johnson was told that from 8:00 a.m. to 4:30 p.m. Monday through Friday, she needed to be available by phone and must be able to report to work within thirty minutes if called during those times.

The investigation was conducted by Carol Adams, an employee from the Iowa Department of Administrative Services, and Kevin Jimmerson, a business manager of MHI.

Johnson was called in to participate in investigatory interviews three times during her paid leave; she was tardy to two of the three interviews. On April 25, she was called and told to report to work in forty-five minutes; she was then eleven minutes late. On May 24, she was called at 8:03 a.m. and told to report at 9:00 a.m.; she did not arrive until 9:35—after being called a second time.

Adams completed an investigative report, which was provided to Cassidy-Wescott, and which concluded Johnson had violated policies and rules of MHI. Dr. Bhasker Dave, Cassidy-Wescott, and Jimmerson reviewed the findings and decided to terminate Johnson's employment. On May 22, an email was sent to DHS informing it of the decision to fire Johnson.

Johnson was informed of the decision on May 28; she was given a termination letter signed by Cassidy-Wescott. The written reasons for termination included: violations of the "violence free workplace policy"—engaging in harassment of another employee or supervisor and making threatening or intimidating statements; a violation of the social network policy, which requires discussion about work on social networks to be limited to "appropriate, professional comments" and not include "patient names or situations"; and multiple violations

of "DHS work rules," including the failure "to cooperate and follow the instructions of supervisors or other designated members of management," engaging in retaliation against another employee, and issues with "[e]xcessive absenteeism and tardiness."

On February 12, 2014, Johnson filed a complaint with the Iowa Civil Rights Commission and the Equal Employment Opportunity Commission alleging discrimination based on race and retaliation.

In October, the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission issued Johnson notices of the right to sue MHI.

Johnson filed her petition at law and jury demand in January 2015. MHI filed a motion for summary judgment, and Johnson resisted;[11] an unreported hearing was held in May 2016.

In its written ruling, the district court granted MHI's motion for summary judgment in its entirety and dismissed Johnson's claims. Johnson appeals.

**II. Standard of Review.**

We review the district court's ruling on a motion for summary judgment for correction of errors at law. *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005). Motions for summary judgment

> should only be granted if, viewing the evidence in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[11] As noted above, Johnson conceded in her filed resistance that her claim for racially motivated hostile work environment was time-barred by statute. She resisted MHI's motion for summary judgment insofar as it pertained to her claims for racial discrimination and retaliatory discharge.

*Id.* (quoting Iowa R. Civ. P. 1.981(3)).

**III. Discussion.**

Title VII of the Civil Rights Act of 1964 was "designed to ensure equal opportunity in employment for all, regardless of sex." *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677 (Iowa 2004). The Iowa Civil Rights Act (ICRA) was modeled after Title VII, so our courts "have consistently employed federal analysis when interpreting the ICRA." *Id.* at 677–78. "Nonetheless, the decisions of federal courts interpreting Title VII are not binding upon us in interpreting similar provisions in the ICRA." *Id.* at 678.

Although one may also establish a claim of discrimination or retaliation by presenting direct evidence, *see Wilson v. City of Des Moines*, 338 F. Supp. 2d 1008, 1026 (S.D. Iowa 2004), the district court determined "there was no direct evidence of either discrimination or retaliation" and considered Johnson's claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); Johnson has not claimed this was in error.

**A. Racial Discrimination.**

"The basic elements of a prima facie case of discrimination in employment are: (1) plaintiff is a member of a protected class; (2) plaintiff was performing the work satisfactorily; and (3) plaintiff suffered an adverse employment action." *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 741 n.1 (Iowa 2003). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully [retaliated] against the employee." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

If the plaintiff is able to establish her prima facie case, the employer's "articulation or evidence must raise a genuine issue of fact as to" a "legitimate, non-discriminatory" reason why it took the adverse employment action(s) against the plaintiff. *Woodbury Cty. v. Iowa Civ. Rts. Comm'n*, 335 N.W.2d 161, 165, 166 (Iowa 1983). "This is a burden of production, not persuasion, and no credibility assessment is involved." *Id.* "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254.

"If [MHI] offers a legitimate nondiscriminatory reason, [Johnson] must show [MHI's] reason was pretextual and that unlawful discrimination was the real reason for the termination." *Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005); *see also Burdine*, 450 U.S. at 253 ("[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."). "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. 804–05).

Here, the district court ruled Johnson could not establish her prima facie case for discrimination because she could not prove the second element—that she was performing the work satisfactorily. "The standard for assessing performance 'is not that of the ideal employee, but rather what the employer could legitimately expect.'" *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2002)

(citation omitted). "The fact that an employee meets some expectations, however, does not mean that she meets that standard if she does not meet other significant expectations." *Id.*

Alternatively, the court also "assume[d], for the purpose of analysis, that Johnson established a prima facie case" and continued with the *McDonnell Douglas* framework, concluding Johnson also could not establish MHI's proffered non-discriminatory reason for terminating her employment was pretextual.

We begin by considering whether Johnson has established that she was completing her work satisfactorily at the time she was terminated. Johnson does not dispute that she was tardy or absent each of the times enumerated by MHI. Rather, Johnson maintains that her work-attendance issues are not enough to find she was not performing her work satisfactorily—especially in light of the fact MHI was "patient" with her and did not fire her until after she complained about being harassed by coworkers.

In contrast to her assertions, Johnson began consistently receiving disciplinary actions for her tardiness and absenteeism approximately six months before she complained about being harassed by her coworkers. Johnson received two written reprimands in August 2012, a one-day suspension in September, and another written reprimand in January 2013. Additionally, although not technically considered a disciplinary action under MHI's internal policy, Johnson received seven coaching and counseling sessions between April 2012 and December 2012 due to her various tardies and unexcused absences. After her February 5 complaint, Johnson received another written reprimand for having been fifty

minutes late on February 3.  She received a one-day suspension in March and a three-day suspension in April before being ultimately fired in May.

Although Johnson maintains her attendance issues were not considered serious by the employer, as evidenced by its "patience" with her, we note that patience—if that is the right term—was built into the progressive disciplinary system.  The policy provides, "Progressive discipline shall not start until an employee has had more than 6 unscheduled incidents in a rolling 12 month period."  The policy then includes six steps for the employer to take, beginning with a coaching and counseling session as step one and continuing through written reprimands, increasing length of suspensions, and finally, termination as step six.

Moreover, Johnson cannot survive summary judgment by arguing that MHI's list of her attendance issues does not show she failed to perform her job satisfactorily.  Johnson has the affirmative burden to establish that she was performing her job satisfactorily—or, at the summary judgment level, to at least present evidence sufficient to create a fact question regarding whether she was. *See Farmland Foods*, 672 N.W.2d at 741 n.1 ("[T]he burden ultimately rests with the plaintiff to establish the claim and show the adverse employment action resulted from discrimination.").  But Johnson has not presented any such evidence—either by disputing MHI's facts or providing her own material facts.  *See Wyngarden v. State Jud. Branch*, No. 13-0863, 2014 WL 4230192, at *7 (Iowa Ct. App. Aug. 27, 2014) ("To find the district court erred in granting summary judgment, we need only find the existence of a fact question.  If we find a fact question concerning [the plaintiff's race] discrimination claim . . ., then the court's grant of summary judgment was improper."); *cf. Keathley v. Ameritech Corp.*, 187 F.3d

915, 920 (8th Cir. 1999) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (finding employee's performance was adequate where she provided evidence she had achieved more than 300% of her quarterly revenue quota and had sold more units than any other salesperson at the time she was fired).

The district court did not err in granting MHI's motion for summary judgment as to Johnson's claim for racial discrimination.

**B. Retaliation.**

The burden-shifting framework employed above is the same for a retaliation claim, but the elements Johnson must prove to establish the prima facie case for retaliation differ. To establish a prima facie case for retaliation, Johnson has the burden to show: "(1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *See Harris*, 679 N.W.2d at 678. Establishing the prima facie case "is a minimal requirement that is not as onerous as the ultimate burden to prove" retaliation. *Smidt*, 695 N.W.2d at 14.

If Johnson is able to establish her prima facie case, the burden again shifts to MHI to offer a legitimate, non-retaliatory reason for the adverse employment action. If the employer succeeds, as above, Johnson has the ultimate and final burden to establish that MHI's stated reason(s) for its action are merely pretextual. *Id.* at 15.

Johnson's burden in the summary judgment proceeding to show a causal connection between her claimed protected activity—the reporting of her

discrimination claim—and her termination requires that she first identify the protected activity. The importance of retaliation claims to the enforcement of civil rights in Iowa requires "keeping the channels of reporting potential civil rights claims free, open and unfettered". *Haskenhoff v. Homeland Energy Solutions, L.L.C.*, 897 N.W.2d 553, 626 (Iowa 2017) (Appel, J., specially concurring). She must then present sufficient evidence to meet the level of causation required, a subject considered by our supreme court in three separate opinions representing a spectrum of the levels of causation adopted in earlier cases. *Id.* (citing *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1 (Iowa 2009); *City of Hampton v. Iowa Civ. Rts. Comm'n*, 554 N.W.2d 532 (Iowa 1996); *Hulme v. Barrett*, 480 N.W.2d 40 (Iowa 1992) (commonly referred to as *Hulme II*)).

In *Haskenhoff*, the trial court instructed the jury the plaintiff had the burden to prove "the protected activity played a part" in the employer's adverse employment action. 897 N.W.2d at 567. The plurality opinion authored by Justice Waterman concluded the trial court should have instructed the jury the claimant's burden of proof was to show the "protected activity was a significant factor motivating the adverse employment action," consistent with precedent in *City of Hampton* and *Hulme II*. *Id.* at 586. In his concurring opinion, Chief Justice Cady also found fault with the trial court's "played a part" jury-instruction language and stated the standard should be "a motivating factor," one that "helped compel the decision" of the employer. *Id.* at 602 (Cady, C.J., specially concurring). Justice Appel found no "great difference between the substantial factor test in *Hulme II* and *City of Hampton* and the motivating factor or played-a-part test in *DeBoom*,"

but concluded the motivating factor or played-a-part test should apply in retaliation cases. *Id.* at 634–35 (Appel, J., specially concurring).

Johnson must show her engagement in a protected activity was a "motivating factor" in MHI's decision to terminate her employment. *See id.* at 635–37 (Appel, J., specially concurring for a majority of court) (applying "motivating factor" causation standard to retaliation claims).

The district court here considered the element of causal connection using two separate claims of protected activity by Johnson: her report of discrimination, dated February 5, 2013, and "whatever protected speech might have been included"[12] in Johnson's Facebook posts of April 2013. The court found Johnson has failed to show a causal connection with relation to either claimed protected activity. We agree.[13]

Whether considering either protected activity as a significant factor or a motivating factor, Johnson has failed to show a causal connection between the claimed protected activity and her termination.

**IV. Conclusion.**

---

[12] Generally, "[t]he First Amendment does not protect speech that constitutes a true threat." *State v. Button*, 622 N.W.2d 480, 485 (Iowa 2001). "A 'true threat' is a statement that an ordinary, reasonable person, familiar with the context in which the statement was made, would interpret as a threat." *Id.*

[13] Johnson's main argument regarding causation appears to be the chronology of events, but considering the date of her second, later claimed protected activity—her Facebook posts on or around April 14—and the date of her termination, May 28, timing is not in favor of Johnson's claims. *See Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010) (finding one month between protected activity and adverse employment action is not close enough to support a finding of causation without something more).

Finding no error in the district court's grant of summary judgment in favor of MHI and the resulting dismissal of Johnson's claim, we affirm.

**AFFIRMED.**

Vaitheswaran, P.J., concurs;  McDonald, J., concurs specially.

**MCDONALD, Judge** (concurring specially)

I respectfully concur in the rationale and judgment of the panel opinion. I write separately on two issues.

With respect to Johnson's claim of discrimination, I would affirm the district court for an additional reason. To establish a prima facie case of race discrimination under the *McDonnell Douglas* framework a plaintiff must show that: (1) she was a member of a protected group; (2) she was qualified to perform the job and was performing satisfactorily; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. *See Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016); s*ee also Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014) (stating the prima facie case under the Iowa Civil Rights Act requires proof of circumstances giving rise to an inference of discrimination); *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 6 (Iowa 2009) (same). Here, the plaintiff failed to show any circumstances surrounding the termination of her employment that would permit an inference of discrimination. She was a poor employee. She has not established she was treated differently than any other employee whose performance and conduct was similarly poor. I would affirm the judgment of the district court on this additional ground.

I next address the retaliation claim. To establish a prima facie case for retaliation, Johnson had the burden to show: "(1) the plaintiff engaged in protected activity; (2) the employer took adverse employment action against the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *See Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004). The plaintiff contends she has established a fact question on her

retaliation claim because it is not disputed the employer terminated her employment, in part, for the posts on Facebook. While Johnson is correct in stating the employer terminated her employment, in part, for her activity on Facebook, she is incorrect in concluding this fact precludes summary judgment. Johnson's conduct on Facebook did not constitute "protected activity" within the meaning of the Iowa Civil Rights Act. *See* Iowa Code § 216.11(2) (2015); *see also Curay-Cramer v. Ursuline Academy*, 450 F.3d 130, 135–36 (3d Cir. 2006) (discussing protected opposition conduct with respect to "public manifestations of disagreement with illegal employment practices"); *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) (stating federal circuits hold "disruptive or unreasonable protests against discrimination are not protected activity under Title VII and therefore cannot support a retaliation claim" and collecting cases); *Van Horn v. Specialized Support Servs., Inc.*, 241 F.Supp.2d 994, 1012 (S.D. Iowa 2003) ("Unlawful, disruptive, or unreasonable protests against discrimination fall outside the scope of Title VII's protections."). To the extent the substance of any of Johnson's posts could be considered protected activity within the meaning of the Iowa Civil Rights Act, the non-protected posts and threats serve as an independent and legitimate non-discriminatory reason justifying the termination of her employment. *See, e.g., Matima*, 228 F.3d at 79 (noting "insubordination and conduct that disrupts the workplace are legitimate reasons for firing an employee"); *Emmanual v. Cushman & Wakefield*, No. 1:13-cv-2894-GHW, 2015 WL 5036970, at *8 (S.D.N.Y. Aug. 26, 2015) (assuming arguendo that Facebook posts were protected conduct but granting summary judgment on the ground the posts violated company policy). I

would affirm the judgment of the district court on this claim for these reasons as well as the reasons set forth in the panel opinion.